**STATE of Maine**

v.

**Steven RICHARDS.**

Supreme Judicial Court of Maine.

Oct. 26, 1972.

John B. Beliveau, County Atty., Thomas E. Delahanty, II, Asst. County Atty., Auburn, for plaintiff.

Platz & Day, J. Peter Thompson, Lewiston, for defendant.

Before DUFRESNE, C. J., and WEBBER, WEATHERBEE, POMEROY, WERNICK and ARCHIBALD, JJ.

WERNICK, Justice.

In the District Court (Northern Androscoggin Division, Livermore Falls) defendant was charged with possessing barbituric acid and amphetamines (a felony in violation of 22 M.R.S.A. § 2210). Pending a hearing on probable cause, defendant moved in the Superior Court (Androscoggin County)—pursuant to Rule 41(e) M.R. Crim.P.—for the suppression as evidence against him of

"any and all quantities of barbituric acid and/or amphetamines held in possession or under the control of the State of Maine."

The ground was that

"if the State does in fact possess such evidence and if it was the Defendant's then it was seized against his will and without a search warrant",

in violation of the Fourth-Fourteenth Amendments of the Constitution of the United States.

The parties submitted to the Superior Court Justice, as the basis for his ruling, an Agreed Statement of Facts as follows.

"On October 26, 1970, at 6:00 p. m. in Turner, Maine, Maine State Policeman, Anthony Braun, was called to the scene of an accident. He arrived there at 6:20 p. m. just as two persons were leaving by ambulance for the hospital. At the scene the officer found a badly damaged automobile which had been rendered inoperable by the accident. This automobile was later found to be registered in the name of Steven F. Richards of Cohassett, Massachusetts.

"Two bystanders advised the officer that one of the occupants had severe head injuries in that his left eye had come out of the socket and he was not conscious. The officer, believing that the accident might be a fatal, commenced looking through the car for the license and registration of the car's owner. While looking for these papers the officer found a jacket inside the car bearing the name Steven F. Richards written in what appeared to be a magic marker. In the front left hand pocket the officer pulled out a plastic bag that contained 30 large red capsules, a small piece of folded tinfoil and a small wooden match box. The match box and tinfoil was separate from the plastic bag. In the match box were two small dark red capsules marked with the Libby F 40 brand which the officer recognized as secobarbital. Identification of the occupants was made at approximately 10:00 p. m. on the same date by a fellow officer who went to the hospital to discover the identification. Two weeks later upon leaving the hospital the Defendant was charged with the felony of possessing these drugs.

"The Defendant's car at no time was impounded nor did the officer enter the motor vehicle of the Defendant for the purposes of taking inventory or securing the articles therein for safe keeping."

On April 22, 1971 defendant's motion for suppression was denied.

Before the probable cause hearing had been held in the District Court the defendant was indicted by the Grand Jury at the June 1971 Term of the Superior Court in Androscoggin County. The indictment contained two counts charging felonies— one the possession of amphetamines and the other possession of a derivative of barbituric acid, to-wit secobarbital.

Upon his plea of not guilty defendant was tried before a jury. During trial defendant renewed his motion to suppress the seized drugs as evidence. The renewed

motion was denied, and the drugs were admitted into evidence over defendant's objections.

Found guilty of both counts of the indictment, defendant now appeals from the judgment of conviction.

We decide that the motions to suppress should have been granted because the drugs were produced by an unconstitutional search and seizure. For the same reason the drugs were erroneously admitted into evidence at the trial. We sustain the appeal.

## I

In one important aspect—delineation of the objective of the police officer in entering the automobile and of his activities while he was inside of it—the Agreed Statement of Facts is unclear. As to the initial entry into the automobile, the facts are stated to be only: (1)

> "The officer, believing that the accident might be a fatal, commenced looking through the car for the license and registration of the car's owner"

and (2)

> "while looking for these papers the officer found a jacket inside the car bearing the name Steven F. Richards written in what appeared to be a magic marker."

As to the next critical step—the intrusion by the officer into the interior of the jacket pocket and his removal from within the pocket of three separate items—the Agreed Statement entirely omits any indication of objective. All that is said is:

> "In the front left hand pocket [of the jacket] the officer pulled out [separately] a plastic bag . . . a small piece of folded tinfoil and a small wooden match box."

We are thus left with ambiguity concerning whether during any, or all, of his activities the officer's purpose might have been *solely and exclusively* to seek only "the license and registration of the car's owner" or whether there was also an objective to find evidence of criminal conduct. The ambiguity is especially striking in relation to the officer's behavior in reaching into the jacket pocket and removing, separately, a plastic bag, a wooden match box and folded tinfoil; these items are hardly likely, from the feel of them, to be a license or registration slip or a container for it.

In light of this uncertainty as to the police officer's objective, we shall dispose of the case by evaluation of each of the potential alternative hypotheses: (1) that there was no purpose whatever to seek evidence of criminal activity, and (2) that there were dual objectives—the ascertaining of information of the identity of the owner of the car (as a step to assist in providing notification to families in the event of serious bodily injury or death) accompanied by an aim to find evidence of possible criminal conduct.

## II

On the assumption that the officer was seeking only to achieve information as to the identification of the victims involved in the collision, the State maintains that, as utilized in the Fourth Amendment, the word "search" is a word of art having a technical meaning which excludes from its scope an intrusion by governmental officials upon private property unconnected with a purpose to seek the fruits, instrumentalities or evidence of criminal activity.

The theory has a surface plausibility. When the Fourth Amendment speaks of "probable cause", it omits to specify any generalized governmental objective against which "probable cause" is to be measured to ascertain its existence in a given instance. The Fourth Amendment thus presents the query: "probable cause" *for what*? Since "probable cause" has been so frequently utilized in the law in relationship to arrests by the police for the commission of crimes and judicial deter-

minations concerning charges of criminal conduct, there is a natural tendency for lawyers and judges to supply an exclusively criminal model. The tendency is reinforced by the Fourth Amendment's use of the word "warrant."

The Supreme Court of the United States (in a five to four decision) in Frank v. Maryland, 359 U.S. 360, 79 S.Ct. 804, 3 L.Ed.2d 877 (1959) [1] gave recognition to such contraction of · the Fourth Amendment concept of a "search". The principle thus established was short-lived. *Frank* was explicitly overruled by the decisions in Camara v. Municipal Court of the City and County of San Francisco, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) and See v. City of Seattle, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967).

The four Justices who had dissented in *Frank* had maintained:

(1) "The Due Process Clause of the Fourth Amendment enjoins upon the States the guarantee of privacy embodied in the Fourth Amendment . . .—whatever may be the means established under the Fourth Amendment to enforce that guarantee. The Court now casts a shadow over that guarantee as respects searches and seizures in civil cases. Any such conclusion would require considerable editing and revision of the Fourth Amendment. For by its terms it protects the citizen against unreasonable *searches and seizures by government, whatever may be the complaint.*" (emphasis supplied) (P. 374, 79 S.Ct. p. 813)

(2) "The Court misreads history when it relates the Fourth Amendment primarily to searches for evidence to be used in criminal prosecutions." (P. 376, 79 S.Ct. p. 814).

(3) "The Fourth Amendment . . . has a much wider frame of reference than mere criminal prosecutions." (P. 377, 79 S.Ct. p. 814)

Four dissenting Justices in Abel v. United States, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960) had again crystallized the error of the *Frank* doctrine, as follows:

" . . . it perverts the [Fourth] Amendment to make this distinction. The Amendment states its own purpose, the protection of the privacy of the individual and of his property against the incursions of officials: the 'right of the people to be secure in their persons, houses, papers, and effects.' . . . Like most of the Bill of Rights it was not designed to be a shelter for criminals, but a basic protection for everyone; to be sure, it must be upheld when asserted by criminals, in order that it may be at all effective, but it 'reaches all alike, whether accused of crime or not.' . . . It is the individual's interest in privacy which the Amendment protects, and that would not appear to fluctuate with the 'intent' of the invading officers. It is true that the greatest and most effective preventive against unlawful searches that has been devised is the exclusion of their fruits from criminal evidence, . . . but it is strange reasoning to infer from this that the central thrust of the guarantee is to protect against a search for such evidence." (PP. 254, 255, 80 S.Ct. p. 705).

When, by a six-three majority, *Camara* and See v. City of Seattle overruled *Frank,* the Supreme Court of the United States in essence adopted the above delineated reasoning previously advanced by the dissenters in *Frank,* four of the Justices in Ohio ex rel. Eaton v. Price, 364 U.S. 263, 80 S.Ct. 1463, 4 L.Ed.2d 1708 (1960) and the dissenters in *Abel,* supra.

---

1. See also: Ohio ex rel. Eaton v. Price, 364 U.S. 263, 80 S.Ct. 1463, 4 L.Ed.2d 1708 (1960) (decision below remaining in effect because of an equally divided court).

Characterizing as a "rather remarkable premise" (387 U.S. p. 531, 87 S.Ct. 1727) the rationale of *Frank*—that a "search" which does not seek " 'evidence of criminal action' which may be used to secure the owner's criminal conviction" (P. 530, 87 S.Ct. p. 1731) touches

" . . . at most upon the periphery of the important interests safeguarded by the . . . protection against official intrusion, . . . " (P. 530, 87 S.Ct. p. 1731)

and, therefore, lies outside the scope of Fourth Amendment protection—*Camara* summarily discarded the premise:

"It is surely anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior." (P. 530, 87 S.Ct. p. 1732).

In footnote 6 of the opinion reference was made to the more complete delineation of the anomaly as set forth in the dissent of Justice Brennan in *Abel* (above quoted). The same footnote further mentioned, as an attack upon the type of reasoning utilized in *Frank,* an opinion written (prior to *Frank*) by Judge Prettyman in District of Columbia v. Little, 85 U.S.App.D.C. 242, 178 F.2d 13, affirmed (on other grounds) 339 U.S. 1, 70 S.Ct. 468, 94 L.Ed. 599 (1950) and an excerpt from which had been quoted in the dissent in *Frank* as follows:

"The argument is wholly without merit, preposterous in fact. The basic premise of the prohibition against searches . . . was the common-law right of a man to privacy in his home, a right which is one of the indispensable ultimate essentials of our concept of civilization. . . . It was not related to crime or to suspicion of crime. It belonged to all men, not merely to criminals, real or suspected. So much is clear from any examination of history, whether slight or exhaustive. The argument made to us has not the slightest basis in history. It has no greater justification in reason. To say that a man suspected of crime has a right to protection against search . . . without a warrant, but that a man not suspected of crime has no such protection, is a fantastic absurdity." (359 U.S. pp. 377, 378, 79 S.Ct. p. 814).

In See v. City of Seattle, supra, the *Frank* doctrine was repudiated as to private property used as commercial premises rather than as a home. Adverting to the point that the Fourth Amendment "search" concept is applied when administrative agency subpoenas of corporate books or records are employed in proceedings without criminal overtones, the Court concluded:

"Given the analogous investigative functions performed by the administrative subpoena and the demand for entry, we find untenable the proposition that the subpoena, which has been termed a 'constructive' search, Oklahoma Press Pub. Co. v. Walling, 327 U.S. 186, 202, 66 S.Ct. 494, 502, 90 L.Ed. 614, is subject to Fourth Amendment limitations which do not apply to actual searches and inspections of commercial premises." (387 U.S. p. 545, 87 S.Ct. p. 1740)

Most recently, in United States v. United States District Court for the Eastern District of Michigan, Southern Division, et al, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972), the Court dealt with electronic intrusions by government officials upon the citizenry's reasonable expectations of privacy, Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); Berger v. New York, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967). It rejected another effort to narrow the applicability of the Fourth Amendment to the "investigation of criminal activity."

The government's argument urging the constriction was summarized in the opinion as follows:

"We are told further that these surveillances are directed primarily to the col-

lecting and maintaining of intelligence with respect to subversive forces, and are not an attempt to gather evidence for specific criminal prosecutions. It is said that this type of surveillance should not be subject to traditional warrant requirements which were established to govern investigation of criminal activity, not on-going intelligence gathering." (92 S.Ct. p. 2137)

Recognizing the pressures to avoid Fourth Amendment applicability because the position was being urged on behalf of the President of the United States in relation to the domestic security of the Nation

"especially at a time of worldwide ferment and when civil disorders in this country are more prevalent than in the less turbulent periods of our history" (92 S.Ct. p. 2138)

the Court, nevertheless, strongly reaffirmed Fourth Amendment coverage. The short answer given to the government's contention was:

"Official surveillance, *whether its purpose be criminal investigation or ongoing intelligence gathering*, risks infringement of *constitutionally protected privacy . . .*" (emphasis supplied) (92 S.Ct. p. 2138)

—the Court revealing that it was especially concerned with the intrusion upon the privacy of speech.[2]

■ It is thus now abundantly clear that even if governmental rummaging about in a citizen's personal belongings lacks the purpose of seeking violation of law for which criminal sanctions are to be imposed, such intermeddling with the privacy of personal beongings is a "search" within the meaning of the Fourth Amendment.[3]

2. It is most enlightening not only in relation to the specific issue presently before us but also generally in the evaluation of the importance of Fourth Amendment guarantees—and as scientific knowledge continues to accumulate so rapidly that each day produces wonders which only the day before could hardly have been anticipated and as the ingenuities of man continue to provide highly effective and unobtrusive techniques by which human privacy can be invaded—that we keep uppermost in our minds the content of footnote 13 in the Court's opinion. That footnote, referring to a book published in 1967 by Professor Alan Westin—in which there is an exposition of the presently available techniques of physical and electronic surveillance and the possible threats posed to personal privacy by ". . . psychological and personality testing and electronic information storage and retrieval"—stresses that: *"Not all of the contemporary threats to privacy emanate directly from the pressures of crime control."* (emphasis supplied) (92 S.Ct. p. 2134) n. 13

3. See also Colonnade Catering Corp . v. United States, 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970) and United States v. Biswell, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972).

The same point has been recognized in a series of decisions in California in which the California courts have been extensively exposed to many of the facets of intrusion by governmental officials upon private property and as deemed to be required to fulfill a variety of governmental interests operative independently of the enforcement of the criminal laws or the imposition of sanctions for the violation of laws. In all of these cases the California courts have proceeded on the underlying foundation that the Fourth Amendment is applicable in terms and its provisions must be met before the intrusion may be said to be constitutionally valid. Illustrative cases are: The People v. Grubb, 63 Cal.2d 614, 47 Cal.Rptr. 772, 408 P.2d 100 (1966) ; Romero v. Superior Court for the County of Los Angeles, 266 Cal. App.2d 714, 72 Cal.Rptr. 430 (1968) ; People v. Superior Court for the County of Los Angeles (Fishback), 2 Cal.App. 3d 304, 82 Cal.Rptr. 766 (1969).

A most recent and highly illuminating confirmation of the applicability of "search" and "seizure" concepts of the Fourth Amendment as applicable even though the official governmental activity, as constituted by an invasion upon private property, is without relationship to the investigation of violations of law resulting in criminal or other sanctions is the case

We, therefore, reject the argument of the State that if

" . . . the present case does not involve . . . exploration for incriminating evidence of any kind but is merely an investigation to determine the identity of victims of . . . [a motor vehicle] accident . . .",

it follows that there is here absent any

" . . . 'search' as the term is used in the constitutional sense [of the Fourth Amendment], and, therefore, the procedure need not be justified within the rubric of the Fourth Amendment."

■ We decide that the Fourth Amendment is fully applicable to the police activity here under evaluation regardless that there was no purpose of the officer to seek the fruits, instrumentalities or evidence of criminal activity.

We proceed, therefore, to consider whether the mandates of the Fourth Amendment were in fact fulfilled.

of Gross v. Fox, 349 F.Supp. 1164 (U.S. D.C.E.Pa.1972) (three Judge Court) in which a governmental official's undertaking to act, pursuant to a Pennsylvania distraint statute, to find and seize personal property of a tenant for the benefit of a landlord was held subject to Fourth Amendment requirements.

The Maine Court has likewise indicated a similar insight when in State Liquor Commission v. Gilbert, Me., 270 A.2d 876 (1970) it stressed that notwithstanding that the proceeding in which the evidence was sought to be excluded and the initial objective of the official inspection of the premises had been unconcerned with "a violation of a criminal law" but pertained only to matters addressed to the continued enjoyment of a liquor license, the Fourth Amendment was applicable and the constitutional validity of the inspection was required to be decided in terms of whether the probable cause and warrant requirements of the Fourth Amendment had been met.

III

To the extent that the State, alternatively, has addressed itself to the issue of compliance with the Fourth Amendment, the State has argued that the warrantless search by the officer was not "unreasonable" and is constitutionally proper since the Fourth Amendment protects against only "unreasonable" searches.

Such approach may be correctly pursued provided that we recognize a governing principle which has clearly emerged in recent years, after a period of prior controversy,[4] for the

"translation of the abstract prohibition against 'unreasonable searches and seizures' into workable guidelines for the decision of particular cases. . . . ." (Camara, supra, 387 U.S. at p. 528, 87 S.Ct. at p. 1730)

■ The principle is that any search is *per se unreasonable* if it lacks two essentials (1) the existence of probable cause, and (2) the prior determination of such probable cause by a neutral and detached magistrate whose determination is reflected

4. The nature of this prior dispute is described in Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) : "Much the most important part of the conflict that has been so notable in this Court's attempts over a hundred years to develop a coherent body of Fourth Amendment law has been caused by disagreement over the importance of requiring law enforcement officers to secure warrants. Some have argued that a determination by a magistrate of probable cause as a precondition of any search or seizure is so essential that the Fourth Amendment is violated whenever the police might reasonably have obtained a warrant but failed to do so. Others have argued with equal force that a test of reasonableness, applied after the fact of search or seizure when the police attempt to introduce the fruits in evidence, affords ample safeguard for the rights in question, so that '[t]he relevant test is not whether it is reasonable to procure a search warrant, but whether the search was reasonable.' " (P. 474, 91 S.Ct. p. 2042.)

in the issuance of a search warrant—this latter requirement of a search warrant being expendable only if there are exigent circumstances in which procurement of a warrant would have strong likelihood of frustrating the fulfillment of the governmental interest conferring the probable cause to intrude upon the privacy of property.

The decisions in *Camara,* Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed. 564 (1971) and United States v. United States District Court, supra, reveal the applicability of this governing principle (of the per se unreasonableness of a warrantless search and seizure) regardless of whether the governmental interest relied upon to provide the probable cause relates to the enforcement of the laws for the imposition of criminal (or other sanctions) or is some other governmental interest which the State has constitutionally asserted in the exercise of its sovereign police power.

In *Camara,* a case in which the governmental interest was an essentially civil regulatory program for the furtherance of public health, the Court emphasized:

" . . . one governing principle, justified by history and by current experience, has consistently been followed: except in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant." (387 U.S. pp. 528, 529, 87 S.Ct. p. 1731)

In Coolidge v. New Hampshire, in which an exploration for evidence of crime was the target of the particular search and seizure, the principle was reaffirmed:

" . . . the most basic constitutional rule . . . is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' The exceptions are 'jealously and carefully drawn,' and there must be 'a showing by those who seek exemption . . . that the exigencies of the situation made that course imperative.' " (403 U.S. pp. 454, 455, 91 S.Ct. p. 2032)

In United States v. United States District Court, in relation to a generalized on-going gathering of information for the preservation of the internal security of the Nation, at least six (perhaps seven) Justices of the Supreme Court of the United States endorsed the governing principle as follows:

(1) " . . . where practical, a governmental search and seizure should represent both the efforts of the officer . . . and the judgment of the magistrate . . . to justify invasion of a citizen's private premises or conversation." (92 S.Ct. p. 2136)

(2) "The Fourth Amendment contemplates a prior judicial judgment, not the risk that executive discretion may be reasonably exercised. . . . Prior review by a neutral and detached magistrate is the time tested means of effectuating Fourth Amendment rights. . . .

"It is true that there have been some exceptions to the warrant requirement. . . . But those exceptions are few in number and carefully delineated, . . . .. Even while carving out those exceptions, the Court has reaffirmed the principle that the 'police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure,' . . . ." (92 S.Ct. p. 2137)

The constitutional validity of the present search (and seizure) is to be adjudicated, therefore, by an approach subdivided into the following inquiries: (1) if no penological police power interest of government is being invoked, is there some other legiti-

mate police power governmental interest being asserted by the State which purports to authorize the class of governmental intrusions upon private property in terms of which a neutral and detached magistrate might find the existence of probable cause for the search in the present particular circumstances;[5] and (2) if such probable cause does exist were there, additionally, exigent circumstances making procurement of a warrant imcompatible with effective fulfillment of the governmental interest establishing necessity for the search?

Unless *both* of these inquiries may be answered in the affirmative, the initial search (and any subsequent seizure of property produced by it) must be held "unreasonable"—in contravention of the Fourth-Fourteenth Amendments of the Constitution of the United States.

In the case at bar we do not reach the second inquiry into whether "exigent circumstances" might have been present to avoid need for procurement of a warrant since we conclude, initially, that the State has not asserted a police power governmental interest generically purporting to require, or authorize, governmental intrusions upon private property against which probable cause for the instant particular police activity could exist.

The State purports to find the declaration of a generalized sovereign police-power mandate, or authorization, for intrusions upon private property of the class here involved in the provisions of 29 M.R. S.A. § 891.

29 M.R.S.A. § 891 does require official investigations of specified types of highway accidents, including the interviewing of participants and witnesses either at the time and scene of the accident or elsewhere; and the official investigation is ordered to be "for the purpose of a statistical analysis and for accident prevention purposes."[6] By no reasonable interpretation of language, however, can the statute be said to require, or authorize, such investigation to be conducted by resort to official intrusions, without consent, upon the citizenry's private property or reasonable expectancies of privacy.

Indeed, the State seems fully aware of this deficiency in its argument. It strives to confer a semblance of plausibility by framing the issue to be only "whether the officer had a right to be at the scene of the accident and a subsequent duty to investigate." Such formulation of the question is entirely beside the point upon which the Fourth Amendment requires attention to be focused. That the State of Maine has given a police officer a right to be "at the scene of an accident", and a duty to investigate the accident, is plainly and simply not tantamount to conferring upon him a right *to be present in the interior of the pockets of a personal jacket of the defendant without his consent,*[7] —the interior of

5. In *Camara* this aspect of the requisite Fourth Amendment inquiry was phrased as follows: ". . . it is obviously necessary first to focus upon the governmental interest which allegedly justifies official intrusion upon the constitutionally protected interests of the private citizen." (387 U.S. pp. 534, 535, 87 S.Ct. p. 1734).

6. 29 M.R.S.A. § 891, in summary, provides for investigations by law enforcement officers of certain types of motor vehicle collisions and as an incident of such investigations the interviewing of participants and witnesses, "either at the time and scene of the accident or elsewhere" to culminate in a written report of the investigation to be transmitted on a designated form to the Chief of the State Police "within 48 hours after [completion of] the investigation" for the purpose of a statistical analysis and for accident prevention purposes. The statute further provides that ". . . the Chief of the State Police may disclose, upon request of any person, the date, time, location of the accident and the names and addresses of drivers, owners, injured persons, witnesses and the investigating officer" and, further, "may upon written requests furnish a photocopy of any report at the expense of the person making the request."

7. The State's approach proceeds on the hypothesis that there was no such consent, either express or implied in fact. The

defendant's jacket pockets having in no wise been knowingly exposed to public view (and the jacket pocket interior, in this respect, being essentially no different from the inside of a suitcase or other. closed container, for example, which might be inside the automobile).

■ Furthermore, even if the police officer might have had a duty and, therefore, a purported authority to enter the immobilized automobile, as an incident of arranging for its removal from the highway (to fulfill the governmental police power interest of maintaining highways free of obstruction), this authorization likewise plainly and simply falls short of authorizing *the intrusion into the interior pockets of defendant's personal jacket* [8]—especially

since the motor vehicle had been disabled by the collision and no need existed to search for the keys to allow the motor vehicle to be driven off the highway under its own locomotive power.

Hence, we conclude that there was here no independent generalized governmental police power interest (on the assumption that the police officer's search was unrelated to a purpose to seek evidence of criminal conduct) purportedly requiring, or authorizing, official intrusions upon private property on the basis of which it might validly be said that there was probable cause for this particular search.

As was made clear in Coolidge v. New Hampshire, it is a foundational objective of the Fourth Amendment (and of the

State makes no claim of a consensually authorized search but relies upon a legitimate supervening police power governmental interest to authorize the intrusion regardless of whether defendant had in fact consented.

Indeed, no other approach is here available to the State. There is no reasonable basis for a contention that the defendant can be treated as having consented, by implication of fact, to the search of the insides of the pockets of his jacket for the purpose of having his identity ascertained to give timely notice to his family or next of kin in the event of his being seriously injured or killed. Such a situation is clearly not analogous to invasions of privacy to provide emergency medical treatment to save the life of, or prevent serious injury to, the victim of a motor vehicle collision who, because of unconsciousness or other incapacitating factor. is unable to give express consent—a situation in which it is reasonably arguable that the victim may be regarded as having impliedly consented in fact because the benefit to him is most likely to have the highest priority in his scheme of personal values.

8. Harris v. United States, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968) is most informative on this point. It reveals that the lawful authority to enter an automobile fails to authorize, ipso facto, additional search for anything not in *plain view.*

It should be observed, further, that Harris v. United States, itself, and many other cases (including those cited in foot-

note 3, supra), disclose that diverse circumstances might involve a variety of governmental police power interests, "administrative" rather than "criminal" or "penological" in nature, sufficiently delineated by law to justify, under exigent circumstances, warrantless police entry into motor vehicles (or other private property) to seek information, to render various types of assistance or to achieve other purposes conceivably of similar import. We have chosen to single out for special mention the police power concern to maintain the highways free of obstruction because it is most directly suggested, illustratively, by the facts presently before us. Hence, our explicit mention of this one facet of governmental activity should not be interpreted to preclude the possibility that other police power factors could likewise operate to justify a warrantless police entry into a motor vehicle, or other private property, for purposes administrative in nature.

Finally, we take pains to clarify that in the case at bar the parties have stipulated facts which eliminate any administrative purpose of the police officer, in relation to the motor vehicle, "of taking inventory or securing the articles therein for safekeeping." This opinion, therefore, neither decides, nor suggests any attitude by the Court upon, the scope of the authority of a police officer in the present, or any other, situation to make a warrantless entry into a motor vehicle for the administrative objective of preparing an inventory, or of arranging for the safekeeping, of its contents.

**139**

magistrate's scrutiny as a special methodology to accomplish the purpose)

" . . . to eliminate altogether searches not based on probable cause. The premise here is that *any* intrusion in the way of search or seizure is an evil, so that no intrusion at all is justified without a . . . prior . . . necessity." (403 U.S. p. 467, 91 S.Ct. p. 2038.)

In the absence, as here, therefore, of any statute purporting to require or permit the official intrusion upon private property, that it might have been a laudable motivation of the officer (as the State further maintains) to attempt to achieve information as to the identity of the victims to provide quick notification to families or next of kin completely misses the point of the interests covered, and the type of protection designed to be afforded, by the Fourth Amendment. The Fourth Amendment's guarantee of the security of the people in the privacy of their persons and property cannot rest upon

" . . . a subjective view regarding the acceptability of certain sorts of police conduct," (pp. 764, 765 of 395 U.S., p. 2041 of 89 S.Ct.)

rather than

" . . . on considerations relevant to Fourth Amendment interests." (Chimel v. California, 395 U.S. 752, 765, 89 S.Ct. 2034, 2041, 23 L.Ed.2d 685)

As *Chimel* further stressed:

"Under such an unconfined analysis, Fourth Amendment protection . . . would approach the evaporation point." (p. 765 of 395 U.S., p. 2041 of 89 S.Ct.)

In District of Columbia v. Little, 178 F. 2d 13 (1949) cited with approval by the Supreme Court of the United States in *Camara* when it overruled *Frank*, as above shown, this very point—that the desirability, or praiseworthiness, of an officer's course of action in a given instance cannot in itself suffice to provide "probable cause" as a measure of the "necessity" required by the Fourth Amendment for a governmental search of private property—was made most cogently and succinctly. The Court said:

"This right of privacy is not conditioned upon the objective, . . . . of the intruding officer. . . . It is immaterial whether he is motivated by the highest public purpose or by the lowest personal spite." (P. 17)

We hold, therefore, that in the present circumstances the intrusion by the police officer into the inside of the defendant's jacket pocket was without probable cause. Consequently, he had made an "unreasonable" search, resulting in an "unreasonable" seizure, and violated the Fourth-Fourteenth Amendments of the Constitution of the United States.[9]

---

9. Our decision that the police officer conducted a search which was unconstitutional—because without probable cause relative to a State asserted police power interest—makes important consideration of a serious question likely to arise with frequency as government might find increasing need to require, or authorize, intrusions upon private property to effectuate various governmental interests unrelated to the exploration of criminal activity.

As the decision of the case at bar now crystallizes, there has been significant impact upon the law of Maine by the series of decisions of the Supreme Court of the United States commencing with the overruling of *Frank* by *Camara* and *See*.

"Administratively-purposed" investigations, inspections or other intrusions upon private property can no longer be considered free of the reach of traditional Fourth Amendment safeguards on the theory that they do not seek the fruits, instrumentalities or evidence of criminal conduct.

Hence, should the State, in a given class of cases, undertake to authorize—and thus provide a potential probable cause foundation—for particular "non-criminally purposed" intrusions upon private property, or the citizenry's reasonable expectations of privacy, such mandate, or authorization, must be accompanied by a system conferring authority upon neutral

## IV

In light of the conclusion that, taken in itself, the police officer's "administrative purpose of seeking identification information was insufficient to authorize the present search, nothing is added as justification when we advert to the hypothesis, previously mentioned, that there were dual objectives for the officer's conduct: finding potential fruits, instrumentalities or evidence of criminal conduct as well as ascertaining identification information to assist in the notification of the families of victims.

The presence of a purpose to find evidence of crime fails to provide the two factors essential to the constitutionality of a warrantless search by the officer: (1) probable cause and (2) exigent circumstances.

Clearly, in the instant situation there was nothing remotely indicating the existence of probable cause for the officer to believe that any criminal conduct was involved.

Independently of the existence or non-existence of such probable cause, there was, further, an absence of exigent circumstances to make impracticable the procurement of a warrant for the search— within the principles enunciated in Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L. Ed.2d 419 (1970), and as further clarified in Coolidge v. New Hampshire, supra. There was no immediate danger that the automobile and its contents would be removed so that the police officer, were he to take the time to procure a warrant, might confront a loss of the automobile and its contents; the automobile was immobilized and subject to the control and custody of the police because of the collision. Its occupants had been taken to the hospital, and nothing appears to suggest that any other person could cause the police to lose control of the automobile and its contents during the period needed to obtain a search warrant.

### Conclusion

The drugs were found as the result of a search conducted in violation of the Fourth-Fourteenth Amendments of the Constitution of the United States. Pursuant to Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) and Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963) the drugs should have been suppressed, and excluded in the trial, as evidence against defendant. It was prejudicial to defendant, and, therefore reversible error, for the Superior Court to have made the contrary rulings.

The entry is:

Appeal sustained.

All Justices concurring.

and detached magistrates to issue appropriate search warrants—if constitutional jeopardy to the project is to be avoided. As was said in *Camara:* ". . . such searches when authorized and conducted without a warrant procedure lack the traditional safeguards which the Fourth Amendment guarantees to the individual, . . . " (387 U.S. p. 534, 87 S.Ct. 1733); and it would undoubtedly be unduly risky, relative to Fourth Amendment requirements, were the State to assume that in most of the important instances of "non-criminally-purposed" searches "exigent circumstances" might exist to salvage a warrantless governmental search.

We take the precaution of providing this warning since, seemingly, Maine law now allows for a *generalized* authorization for the issuance of search warrants by "a neutral and detached magistrate" only in relation to criminal proceedings and property classifiable as contraband, or the fruits, instrumentalities or non-testimonial evidence of criminal conduct. 15 M.R. S.A. § 55, as implemented by Rule 41 M. R.Crim.P.