**STATE of Maine**

v.

**Perley MOULTON, Jr.**

Supreme Judicial Court of Maine.

Argued May 10, 1984.

Decided Aug. 16, 1984.

John R. Atwood, Dist. Atty., William R. Anderson (orally), Asst. Dist. Atty., Belfast, for the State.

Anthony W. Beardsley (orally), Ellsworth, for defendant.

Before McKUSICK, C.J., and NICHOLS, ROBERTS, WATHEN, GLASSMAN, and SCOLNIK, JJ.

McKUSICK, Chief Justice.

Defendant Perley Moulton, Jr. appeals from his convictions for theft, 17–A M.R.S.A. § 353 (1983) (Class B), burglary, 17–A M.R.S.A. § 401 (1983) (Class C), and theft, Class C, entered after a jury-waived trial in Superior Court (Waldo County). Defendant argues that the Superior Court erred by admitting in evidence 1) the results of a search of the garage premises in Belfast used by defendant and 2) a recording made by the police of defendant's conversations with a co-defendant who was wearing a body wire transmitting device. We reject his appeal as to the search and seizure issue, but agree that the Superior Court should have excluded the evidence obtained by the body wire recordings.

The State appeals from orders of the Superior Court that dismissed three counts of theft against Moulton for lack of proper venue. We agree with the State and remand those counts of theft for restoration to the docket.

In April 1981, a Waldo County grand jury indicted Perley Moulton and Gary Colson on three felony counts of theft by receiving two trucks and some auto parts, in addition to a misdemeanor count of theft by receiving an automobile. Moulton moved to suppress evidence seized as a result of a search of the garage premises formerly occupied by the auto dealership of Belfast Dodge.[1] By order dated February 11, 1982, the Superior Court denied the motion to suppress as to most of the items involved.

During November and December 1982, meetings were held between co-defendant Gary Colson and Belfast police officers which resulted in a tap being placed on Colson's phone and a wire placed on his body to transmit an in-person conversation Colson had with Moulton. The recordings from the body wire produced additional evidence later used against Moulton.

On January 21, 1983, a Waldo County grand jury handed down seven indictments against Moulton. Since the new indictments covered the incidents alleged in the original indictments as well as several new charges, the original indictments against Moulton were subsequently dismissed. Moulton moved to suppress the statements recorded by Gary Colson and again moved to suppress the evidence seized as a result of the search at Belfast Dodge. On June 14, 1983, a different Superior Court justice denied the motion as to the statements made to Colson, and on September 2, 1983, that justice denied the motion as to the Belfast Dodge search on the ground that the issue had already been decided in the February 11, 1982, order.

The seven indictments were disposed of as follows. The Superior Court accepted defendant's guilty pleas on two indictments for theft (Docket Nos. CR–83–10, 11). Without trial, the court dismissed two indictments for theft (Docket Nos. CR–83–12, 14) for improper venue. On September 6–8, 1983, a jury-waived trial on all the other indictments was held in Superior Court. At the conclusion of the trial, on motion of defendant's counsel, the court dismissed one of the indictments for theft for improper venue (Docket No. CR–83–15). Defendant was found guilty of both theft and burglary (Class C) as charged in two counts in Docket No. CR–83–13 and of theft (Class B) as charged in Docket No. CR–83–16; and he now appeals those convictions. The court found defendant not guilty of the arson charge (Docket No. CR–83–16).

### I. State's Appeal: Venue

The three indictments dismissed on venue grounds involved similar fact patterns. In each, the indictment charged that Moulton "did obtain or exercise unauthorized control over the property ·of another," to wit, three motor vehicles. Moulton allegedly took each vehicle in Penobscot County and brought them into Waldo County.

These indictments track the language of 17–A M.R.S.A. § 353 (1983), which provides:

A person is guilty of theft if he obtains or exercises unauthorized control over the property of another with intent to deprive him thereof.

The Superior Court ruled that, in each case, a completed theft under section 353 occurred prior to the time Moulton brought the vehicles into Waldo County. The crime defined in section 353, however, has a continuing nature and Moulton would continue in violation of section 353 when he took a stolen vehicle into another county. *See*

---

1. By decision dated September 9, 1981, a Superior Court justice decided this suppression motion. The parties, however, were unable to obtain a transcript of that suppression hearing and

a new hearing was held. The order stemming from the first hearing has played no role in subsequent proceedings.

*Crosby v. State,* 232 Ga. 599, 600, 207 S.E.2d 515, 517 (1974); *Brown v. State,* 281 So.2d 924, 927 (Miss.1973). As we said in *Mayo v. State,* 258 A.2d 269, 270 (Me.1969), "[i]f goods are stolen in one county and carried by the thief into another county, he may be prosecuted for the crime in either county." In such circumstances, the crime of theft is committed in both counties and, by M.R.Crim.P. 18, the State may choose the county in which to prosecute.[2] *People v. Jennings,* 10 Cal.App.3d 712, 89 Cal. Rptr. 268 (1970); *State v. Bassett,* 86 Idaho 277, 284–85, 385 P.2d 246, 250 (1963); *Jones v. Commonwealth,* 453 S.W.2d 564 (Ky.1970); 22 C.J.S. *Criminal Law* § 185(18), at 480 (1961).

■ We therefore sustain the State's appeal of the dismissal of the three charges of theft for want of proper venue. As a consequence, we remand those cases to the Superior Court for further proceedings. There is no double jeopardy problem with a retrial in Docket No. CR–83–15, which was dismissed at the conclusion of trial. The Superior Court ordered dismissal of that charge on defendant's motion. Before granting defendant's motion the Superior Court made certain that defendant and his counsel understood that dismissal would render defendant subject to prosecution on the same charge in Penobscot County. By seeking dismissal, defendant must run the risk that the State might prevail on appeal, thereby permitting a retrial. *See United States v. Scott,* 437 U.S. 82, 99–100, 98 S.Ct. 2187, 2198, 57 L.Ed.2d 65 (1978) (dismissal after full trial, on the defendant's motion, for pre-indictment delay).

### II. *Defendant's Appeal*

#### A. *Recorded statements*

At trial the State introduced in evidence a recording of a conversation between co-defendants Gary Colson and Perley Moul-

ton. The Superior Court, in a pretrial suppression hearing, had found that the manner in which the police made this recording did not violate Moulton's sixth amendment right to counsel. We reverse.

On November 4, 1982, Gary Colson called Police Chief Keating and said that he had been receiving threats regarding the criminal charges pending against Colson and Moulton. On November 6, 1982, Colson met with Moulton, at which meeting Moulton allegedly revealed his plans to kill Gary Elwell, a State's witness. Twice within the next four days, Colson met with Chief Keating and Officer Rexford Kelley. Colson discussed the threats he had received from someone other than Moulton, as well as Moulton's plans to kill Elwell and to threaten other witnesses. Chief Keating had previously been informed that other witnesses in the Moulton case had reported receiving threatening phone calls. With Colson's consent, Chief Keating placed a recording device on Colson's phone. Colson recorded three telephone conversations he had with Perley Moulton.[3] Gary Colson also arranged to meet Moulton in late December, 1982. In preparation for this meeting, Chief Keating provided Colson with a body wire transmitter. By Colson's use of the body wire, the police were able to record Colson's conversation with Moulton. That lengthy conversation focused on the upcoming trial on the charges against Moulton and Colson. During the conversation Moulton made several incriminating statements that were later used against him at trial.

■ The sixth amendment requires suppression of an accused's statement if, after the initiation of adversary proceedings, the State, or its agent, has deliberately elicited an incriminating statement, *see Massiah v. United States,* 377 U.S. 201,

---

**2.** We also note—as we did in *State v. Terrio,* 442 A.2d 537, 540 n. 5 (Me.1982)—that we are aware of no case since the 1930 creation of a single, state-wide Superior Court which has held that a variance in proof of venue as opposed to jurisdiction is fatal.

**3.** The recordings of the three Colson-Moulton telephone conversations were the subject of a suppression motion, which was denied, but the recordings were not offered at trial.

206, 84 S.Ct. 1199, 1203, 12 L.Ed.2d 246 (1964), or the State has intentionally created a situation "likely to induce a defendant to make incriminating statements," *see United States v. Henry*, 447 U.S. 264, 274, 100 S.Ct. 2183, 2189, 65 L.Ed.2d 115 (1980); *State v. White*, 460 A.2d 1017, 1021 (Me. 1983). The Superior Court found that the State did not deliberately elicit or create a situation likely to induce Moulton to make incriminating statements. On appeal, the justice's ruling on this issue "will be upheld if 'the evidence in the record provides rational support for the conclusions he reached'." *Id.* (quoting *State v. Bleyl*, 435 A.2d 1349, 1358 (Me.1981)).

In its ruling the Superior Court focused upon the motives of the Belfast police officers who dealt with Colson in setting up the body wire recording system. The Superior Court found that the recordings were made "for legitimate purposes not related to the gathering of evidence concerning the crime for which the defendant had been indicted." On our review, we find ample evidence that supports this conclusion. Chief Keating was concerned about Colson's safety and about gathering information relating to possible threats made against other witnesses in the case against Moulton.

■ Although, as the police knew, Moulton was represented by counsel and had exercised his right to remain silent, the police were free to gather information via the body wire regarding possible crimes, such as the threats against witnesses, *not already* the subject of judicial proceedings. *See United States v. DeWolf*, 696 F.2d 1 (1st Cir.1982). However, the State's valid purpose in investigating other criminal activity cannot remove from constitutional scrutiny evidence thereby uncovered that relates to alleged criminal acts for which the right to counsel has *already* attached. As explained in *Massiah:*

> We do not question that in this case, as in many cases, it was entirely proper to continue an investigation of the suspected criminal activities of the defendant and his alleged confederates, even though the defendant had already been indicted. All that we hold is that the defendant's own incriminating statements, obtained by federal agents under the circumstances here disclosed, could not constitutionally be used by the prosecution as evidence against *him* at his trial.

377 U.S. at 207, 84 S.Ct. at 1203 (emphasis in original).

■ Reference to the State's legitimate motive may be relevant to, but cannot wholly refute, the alleged infringement of Moulton's right to counsel. The State cannot use at trial against Moulton the fruits of such recording devices where the State should have known that the situation it intentionally created would likely induce Moulton to make incriminating statements. *See Henry*, 447 U.S. at 271, 100 S.Ct. at 2187.

The record plainly reveals that the police knew, or should have known, that Moulton likely would make incriminating statements at the meeting that Colson recorded. As the Superior Court found, "Chief Keating admitted that by this time [just prior to the Colson-Moulton conversation] he was aware that Colson and Moulton [co-defendants in a multi-count criminal prosecution] would probably discuss their upcoming case at the meeting." The fact that Moulton and Colson were friends and co-defendants was of central importance in this case. That close relationship significantly increased the chance, as Chief Keating should have known, that Moulton would confide incriminating information to Colson. A defendant's normally cautious approach to dealing with government agents is replaced by an "off-guard" openness when dealing with an undisclosed police informant. Moulton "was more seriously imposed upon because he did not know that his codefendant was" working with the police. *Henry*, 447 U.S. at 273, 100 S.Ct. at 2188; *see Massiah*, 377 U.S. at 206, 84 S.Ct. at 1203; *Malone v. State*, 390 So.2d 338

(Fla.1980), *cert. denied,* 450 U.S. 1034, 101 S.Ct. 1749, 68 L.Ed.2d 231 (1981).

The Superior Court found that "Colson was told to try to act like himself, converse normally, and avoid trying to draw information out of Moulton." Even granting that this is an accurate characterization of Colson's mission, this finding in no way suggests that Chief Keating should not have expected Moulton to incriminate himself. Whether or not Colson intended to question him, or merely engage in conversation, the fact that the conversation would concern the pending charges made it likely that Moulton would incriminate himself. In *Henry,* an informant contacted the police, who advised him "to be alert to any statements made by the federal prisoners, but not to initiate any conversation with or question Henry regarding the bank robbery." 447 U.S. at 266. Notwithstanding this finding, the Supreme Court concluded that Henry's statements were obtained in violation of his right to counsel. A review of the transcript of the Colson-Moulton meeting makes clear that Colson was not merely a "passive listener." *See United States v. Franklin,* 704 F.2d 1183 (10th Cir.1983). Instead, Colson frequently pressed Moulton for details of various thefts and in so doing elicited much incriminating information that the State later used at trial. This is precisely what Chief Keating should have anticipated. His advice to Colson to avoid actively questioning Moulton is an insufficient protection where Colson and Moulton were planning to discuss the upcoming criminal trial. By the time the body wire was placed on him, Colson was fully cooperating with the police and no longer stood in the same adversarial position as did Moulton.

When the police recommended the use of the body wire to Colson they intentionally created a situation that they knew, or should have known, was likely to result in Moulton's making incriminating statements during his meeting with Colson. The police's valid purpose in investigating threats against witnesses does not immunize the recordings of Moulton's incriminating statements from constitutional attack. Those statements may be admissible in the investigation or prosecution of charges for which, at the time the recordings were made, adversary proceedings had not yet commenced. But as to the charges for which Moulton's right to counsel had already attached, his incriminating statements should have been ruled inadmissible at trial, given the circumstances in which they were acquired.

### B. *Search and seizure issues*

Although we vacate defendant's three convictions because of the erroneous admission of the body wire recording and so have no necessity of addressing the search and seizure issues, we do so for purposes of judicial economy because the issues are likely to arise on retrial. *See, e.g., Cutillo v. Gerstel,* 477 A.2d 750 (Me.1984); *Boston Milk Producers, Inc. v. Halperin,* 446 A.2d 33, 37 (Me.1982).

### 1. *Prior adjudication*

■ Moulton argues that the Superior Court erred in its order dated September 2, 1983, that Moulton was not entitled to relitigate the search and seizure issues. The Superior Court justice concluded that:

> Since the present motion addresses the same search, the same evidence, and the same defendant and counsel, the fact that the defendant has been reindicted under a different theory of theft does not warrant a new hearing and order concerning the admissibility of the same evidence against him.

On February 11, 1982, the Superior Court fully considered the arguments relating to the evidence obtained in the search at Belfast Dodge. In a separate proceeding between the same parties, collateral estoppel bars relitigation of issues that were actually litigated in the first proceeding. *Restatement (Second) of Judgments* § 27 (1982). This principle is unquestionably a part of the criminal law. *Ashe v. Swenson,* 397 U.S. 436, 442, 90 S.Ct. 1189, 1193, 25

L.Ed.2d 469 (1969); *State v. Spearin*, 463 A.2d 727, 729–30 (Me.1983) (applying *Ashe*); *see* 21 Am.Jur.2d *Criminal Law* § 321 (1981).

■ The fact that Moulton was reindicted on different theories of theft and additional charges of burglary and arson does not invalidate the prior order made when the State had indicted Moulton only for receiving stolen goods. These changes in the indictments did not prejudice Moulton's rights in seeking suppression of the fruits of the search and seizure. The charges Moulton faced at the time of the earlier hearing were sufficiently serious that he "had every incentive to litigate" at that hearing "fully and vigorously." *Parklane Hosiery v. Shore*, 439 U.S. 322, 332, 99 S.Ct. 645, 652, 58 L.Ed.2d 552 (1979). The new charges did not change any of the issues that would be addressed if the Superior Court had given Moulton yet another suppression hearing. The search at Belfast Dodge was valid or invalid irrespective of the charges on which the State ultimately proceeds. As we discuss below, the probable cause and exigency issues must be resolved based upon facts known to the police at the time of the search. *See State v. Fillion*, 474 A.2d 187, 189 (Me.1984). On appeal, defendant's attack must concentrate upon the Superior Court's February 11, 1982, order denying his suppression motion.

### 2. *Standing*

The State argues on appeal that Moulton lacks standing to challenge the validity of the search and seizure at Belfast Dodge. The Superior Court rejected the State's argument, finding that Moulton had a legitimate expectation of privacy in the premises. *See Rakas v. Illinois*, 439 U.S. 128, 140–41, 99 S.Ct. 421, 428–29, 58 L.Ed.2d 387 (1978). The facts of record provide ample support for the Superior Court's conclusion.

■ Donald Marcia operated the Belfast Dodge dealership until he went out of business at some time prior to January, 1981. At the request of Chrysler Credit Corporation, Marcia maintained a presence at Belfast Dodge to deter vandalism. He used the main building and rented the service bays at the rear to defendant Perley Moulton, his son-in-law. Moulton, and not Marcia, had the keys to the service bay door locks. Moulton was using the service bays to work on motor vehicles. On these facts, the Superior Court committed no error in concluding that Moulton had enough of an interest in controlling access to the service bays to give him standing to challenge the warrantless search.

### 3. *Probable cause*

On December 4, 1980, the Belfast police were informed that auto parts and a pickup truck had been stolen from Lothrop Ford the previous night. The truck was recovered from a lake later that same day. At some later time prior to January 15, 1981, the police received an anonymous tip that the stolen parts could be found at Belfast Dodge.

On January 14, 1981, Richard Fairbrother reported to the Belfast Police Department that one of his dump trucks had been stolen. When Officer Richard Rumney reported to work at the Belfast Police Department at 4:00 p.m. on January 15, 1981, he was told that the police had received an anonymous phone call advising the department that they could find the Fairbrother dump truck at Belfast Dodge. Officer Rumney went to visit Marcia at Belfast Dodge. The Belfast Dodge complex consists of a main building previously used as a showroom and a second building, back from the highway, containing six service bays. Marcia said he could not authorize a search of the service bays. At that time Rumney conducted a search limited to the main building but found nothing.

Officer Rumney continued on his patrol duties until he received a radio call at 11:00 p.m. directing him to a fire near the former Knights of Columbus Hall located in a wooded area off Route 137. Upon reaching the fire scene, which was about a quar-

ter mile from Belfast Dodge, Rumney found a dump truck fitting the description of that stolen from Fairbrother engulfed in flames. Rumney noted that various parts of the truck, such as its fenders, hood, doors, radiator, and so-called West Coast mirrors, had been removed.

Rumney followed the tire tracks from the truck back about 100 feet to Route 137 where the trail ended because the pavement was dry. Officer Raymond Meder, who joined Rumney at the scene, followed footprints in the snow leading away from the fire out to Route 137 and then along the side of that highway for about a mile in the direction away from Belfast Dodge. These footprints ended at the intersection of Route 137 and Shepherd Road, suggesting that the person making the prints had been picked up by a motorist.

Rumney returned to the Belfast Dodge complex. In the snow on the small road next to the body shop he saw truck tire tracks that resembled those of the Fairbrother truck. The tracks ended in front of bay number four. Rumney saw that bay four was dark, but the first three bays were lighted. Two other bays are located around to the back. As Rumney opened the door to bay four he heard a hissing sound. Rumney entered bay four, discovered that the hissing sound came from an air wrench, and found tools and auto parts that resembled corresponding parts of the Fairbrother truck.

Officer Meder arrived and together with Rumney searched various bays of the body shop. They found no suspects but did find auto parts resembling those reported stolen from Lothrop Ford. Police Chief Keating arrived and, with the help of a Lothrop Ford employee, assisted the other officers in seizing and identifying auto parts. The police posted a guard and, on the basis of the information gained from the initial entry, obtained a search warrant. Armed with that warrant, they seized more tools, auto parts, and a pickup truck.

■■■■ The Superior Court found that the warrantless search of the premises for a suspect was justified under the exigent circumstances exception to the fourth amendment. To justify such a search, the police must have had both probable cause to believe that a criminal suspect was on the premises as well as an exigency that precluded them from securing the premises long enough to obtain a search warrant. *See State v. Libby,* 453 A.2d 481, 484 (Me. 1982); *State v. Blais,* 416 A.2d 1253, 1256 (Me.1980). The Superior Court found that "probable cause for a search of the premises for suspects existed in this case." This finding is entitled to deference on appellate review and should be reversed only if "clearly erroneous." *See State v. Smith,* 379 A.2d 722, 724 (Me.1977). Such an error exists only if there is no competent evidence to support the Superior Court's conclusion. In addition to facts explicitly found by the Superior Court, we must assume that the Superior Court made all of the findings necessary to its decision. *See State v. Walker,* 341 A.2d 700, 702 (Me. 1975).

■■■■ We have held that

Probable cause to search exists when the officers' personal knowledge of facts and circumstances, in combination with any reasonably trustworthy information conveyed to the police, would warrant a prudent person believing that the search would disclose criminal conduct or items that would aid in identifying a criminal or establishing the commission of a crime.

*State v. Smith,* 379 A.2d at 724. The facts known to the investigating officers gave them ample cause to search the Belfast Dodge complex. The anonymous tips would be of limited import on their own. *See Illinois v. Gates,* 462 U.S. 213, ——, 103 S.Ct. 2317, 2326, 76 L.Ed.2d 527 (1983). By the time of the search, however, the police had discovered substantial information to corroborate the second tip. *See Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); *State v. Blais,* 416 A.2d at 1256. On answering the

call to the fire, the police discovered Fairbrother's truck. Also, they observed that the truck had been dismantled in a manner that suggested the thief had the use of tools such as those that would be found in a body shop. The location of the truck only a quarter of a mile from the Belfast Dodge complex provided additional support for the conclusion that the informant was correct in telling the police that the truck had at one time been taken to Belfast Dodge. The tire tracks in front of bay four were, in the opinion of Officer Rumney, similar to those that would be made by the tires on the Fairbrother truck. *See State v. Heald*, 314 A.2d 820, 825 (Me.1973) (analysis of tracks in snow can be important in establishing probable cause). These facts, along with the tip received by the police linking Belfast Dodge with the theft of auto parts from Lothrop Ford, gave the officers sound reason to suspect that continuing criminal activity relating to motor vehicles and parts was associated with those premises.

In addition to the ever-present possibility that a suspect will be at his base of operations, several facts known to the investigating officers support the Superior Court's finding that probable cause existed to believe that one or more suspects were on the premises at the time of the search. Although the footprints at the site of the burning Fairbrother truck led away from Belfast Dodge, Officer Meder discovered that they ended along the road, indicating that the person responsible for the fire had been picked up by a motorist. Given the relatively short distance involved, the police could fairly conclude that this suspect had circled back to Belfast Dodge prior to Officer Rumney's arrival there. The condition of the building indicated that someone may have been on the premises. The lights were still on in at least three of the service bays and some of the padlocks on the doors were left hanging in an unlocked position. These facts suggested to Officers Rumney and Meder that the building had not been locked up for the night but instead was still being used. Taking this information into account, the Superior Court found that, given the field experience of these officers, they had probable cause to believe that a criminal suspect was on the premises.

### 4. *Exigent circumstances*

Having probable cause to search, the officers were required to obtain a search warrant unless also there were present exigent circumstances. Such circumstances exist where there is a compelling need to conduct a search and insufficient time in which to secure a search warrant. *See Michigan v. Tyler*, 436 U.S. 499, 509, 98 S.Ct. 1942, 1949, 56 L.Ed.2d 486 (1978); *State v. Johnson*, 413 A.2d 931, 933 (Me.1980). In exigent circumstances, to require the officers to delay the search until they have obtained a warrant "would have a strong likelihood of frustrating the fulfillment of the governmental interest conferring the probable cause to intrude upon the privacy of property." *State v. Richards*, 296 A.2d 129, 136 (Me.1972); *see also State v. Hassapelis*, 404 A.2d 232, 236 (Me.1979); *State v. Barclay*, 398 A.2d 794, 797 (Me. 1979). The officers' legitimate concern with apprehending a suspect, *see Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) (hot pursuit), is heightened in cases involving particularly dangerous criminal activity. *See State v. Johnson*, 413 A.2d at 933 (apparently dead body on premises creates exigency); *State v. Morse*, 394 A.2d 285, 288 n. 4. (Me.1978) (exigency due to person acting wild in area near children); *State v. Smith*, 379 A.2d at 724 (dangerous suspect). To the officer's knowledge, the suspect or suspects in these crimes, in addition to stealing motor vehicles and parts, had driven one vehicle into a lake and had set another on fire.

The Superior Court found that "[i]t was not possible at that time, with only two officers present, to fully secure the premises while a warrant was obtained." *See State v. Blais*, 416 A.2d at 1257. "In determining whether exigent circumstances are present, the trial judge must use his own judgment, applied to the evidence before

him; we review his decision only for clear error." *State v. Patten,* 457 A.2d 806, 810 (Me.1983). On the record before us we cannot find clear error in the Superior Court's finding of exigent circumstances. The Belfast Dodge complex is quite large. In addition to the main building, a service area is located some 100 feet away and to the rear. The service building consists of six bays, each large enough to hold a motor vehicle, and a seventh room, apparently once used as a bathroom. From what we can discern from the record and a chart introduced as an exhibit, four of the bays are lined up side-by-side. Bay five is behind the first four bays and has a door opening to the side, perpendicular to the line formed by the first four bays. Bay six is behind bays one and two, with a door that opens toward the side, in the opposite direction of bay five. Thus, there are bays on three sides of the service area complex. Each bay has a door large enough for an automobile to pass through, and there are seven other smaller doors intended for human passage located around the complex. The officers had no way of knowing in which bay or room a suspect might be, and, without first entering the complex, could not know the extent to which a suspect could move around inside from bay to bay. We cannot assume that the officers could have quickly obtained a search warrant in the middle of the night in Belfast. Considering all of these facts, the size of the complex, the number of possible exits, the danger posed by the suspect in an auto body shop where tools, vehicles, and flammable liquids would likely be found, and the time of the night, we find competent evidence to support the Superior Court's conclusion that the officers, even with backup assistance, could not adequately secure the complex for the time it would take to obtain a search warrant. *Compare McDonald v. United States,* 335 U.S. 451, 455, 69 S.Ct. 191, 193, 93 L.Ed. 153 (1948) (officers able to secure facilities), *with State v. Smith,* 379 A.2d at 725–26 (officers unable to secure facilities due to danger posed by suspect).

Since we conclude that defendant has failed to show any reversible error in the Superior Court's finding that the officers were justified in entering the building without a search warrant, we must conclude that the officers were entitled to seize the items they saw inside the service bays. The Superior Court found that those items were in plain view, *see Coolidge v. New Hampshire,* 403 U.S. 443, 465–66, 91 S.Ct. 2022, 2037–38, 29 L.Ed.2d 564 (1971); *State v. Mitchell,* 390 A.2d 495, 499 (Me. 1978); and on appeal defendant does not challenge that finding. Therefore, not only were these original seizures without a warrant reasonable under the fourth amendment, but also the subsequent search warrant obtained in part on the basis of those items found in plain view was valid. The warrant was not tainted as the fruit of any illegal search.

5. *Specificity of search warrant*

Defendant's argument that the search warrant and accompanying affidavit in the case at bar did not sufficiently describe the place to be searched and items to be seized is without merit. A warrant adequately identifies the place to be searched if "the officers thereby are enabled to ascertain and identify the place intended by reasonable effort." *State v. Brochu,* 237 A.2d 418, 422–23 (Me.1967) (description of place "known as the dwelling of Armand A. Brochu" adequately describes house, garage, and out-buildings subject to search). The present warrant described with particularity the location of Belfast Dodge and identified the service bays as the area subject to search. Defendant's argument that the warrant did not specify which bays may be searched ignores the fact that the officers had cause to search any and all of the bays. Defendant further argues that the Superior Court should have suppressed all of the items seized pursuant to the search warrant as not having been sufficiently described in the warrant. The Superior Court granted the motion to suppress as to some items; as to the remain-

ing items, we find no reversible error. The attached affidavit supplemented the description contained in the search warrant. *See State v. Corbin,* 419 A.2d 362 (Me. 1980). That affidavit listed in detail the number and type of auto parts "stolen from Lothrop Ford in Belfast, Maine on 12/3/80 and body parts removed from a 1978 Maroon 65 series (2) ton Chevrolet dump truck stolen from Richard Fairbrother of Prospect, Maine." The affidavit contained descriptions such as "10 boxes of spark plugs, 1 R–27 Battery, 3 r–55 Batteries ...." Under the circumstances, those descriptions were sufficiently detailed.

The entry is:

Superior Court's dismissal of the indictments in Docket Nos. CR–83–12, 14, and 15 vacated.

Superior Court's judgments of conviction in Docket Nos. CR–83–13 and 16 vacated.

Cases remanded to the Superior Court for further proceedings consistent with the opinion herein.

All concurring.