### STATE of Maine

v.

### Nicholas HASSAPELIS.

Supreme Judicial Court of Maine.

July 30, 1979.

Henry N. Berry, III, Dist. Atty., Peter G. Ballou, Deputy Dist. Atty., William Keefe, Law Student (orally), Portland, for plaintiff.

Terence Farrell (orally), Portland, for defendant.

Before McKUSICK, C. J., and POMEROY, WERNICK, ARCHIBALD, DELAHANTY, GODFREY and NICHOLS, JJ.

DELAHANTY, Justice.

After a bench trial, preceded by a suppression hearing, held in Superior Court, Cumberland County, the defendant was convicted of conspiracy to commit armed robbery, 17-A M.R.S.A. §§ 151(1), 651, and sentenced to two and one-half years in the Maine Correctional Center. On appeal, he argues that (1) the indictment under which he was charged failed adequately to inform him of the details of the crime he was alleged to have committed and (2) certain physical evidence seized by the police should not have been admitted against him at trial. We deny the appeal.

An examination of the transcripts of the trial and of the suppression hearing, taken in the light most favorable to the court's verdict, reveals the following sequence of events.

The object of the defendant's criminal design was The Place, a Portland pizza shop located on Forest Avenue near Pitt Street. Jimmy MacDonald worked at The Place from time to time doing odd jobs in return for cigarettes and other favors. MacDonald and the defendant knew each other well having lived in the same building sometime previously; furthermore, the defendant stated that he and Shelby MacDonald, Jimmy's sister, were engaged to be married. Early in December, 1977, the defendant asked Jimmy MacDonald various questions about the operation of The Place. From MacDonald's answers, he learned that it remained open until 2:00 a. m. on Saturdays and Sundays and that the proprietor made his night deposits at the Canal Bank just three buildings down Forest Avenue from The Place.

On one occasion, the defendant, his brother, Theodore, MacDonald, and another teenager named Donald French left MacDo-.

nald's house together and drove to a secluded parking lot. Remaining inside the car, the defendant explained to MacDonald that he was considering "hitting" or "robbing" The Place and asked if MacDonald would be interested in joining them.[1] He refused.

Apparently concluding that the defendant was poised to strike, MacDonald approached the proprietors of The Place and told them to be prepared for a robbery. Robert Litman, one of the proprietors, passed MacDonald's tip along to the Portland police and the information was relayed to all officers responsible for patrolling the area in question.

One of the policemen who was aware of the tip was Officer John Whitmore. At 1:50 a. m. on Sunday, December 18, 1977, Whitmore was driving south on Forest Avenue. He checked The Place, noticed that there were customers inside, and turned right on Pitt Street. Ten or fifteen feet up Pitt Street, he saw a red and white jeepster parked facing The Place with two men inside. The jeepster's engine was on, its lights were off, and the two men were watching The Place. As Whitmore drove past the jeepster, he observed that when the driver noticed him "he [the driver] kind of double taked and immediately bent down toward the floor of the . . . jeep." The person in the passenger seat "kind of raised up in the seat and watched [Whitmore] go all the way past him." Whitmore made two left turns, parked on a parallel block, and called Portland Police Officer Christopher Murphy to inform him that "[there was] a possible 1090 [armed robbery] that was going to occur at The Place." From his position, Whitmore observed Murphy's cruiser going north on Forest Avenue. He then saw the jeepster pull out and drive south on Forest Avenue while both occupants peered into The Place. The jeepster turned right and drove slowly past Whitmore's cruiser. Whitmore radioed Murphy that the jeepster was moving and followed after it. Eventually, Whitmore pulled the jeepster over and Murphy arrived, parking

in front of the jeepster so as to cut off all avenues of escape.

Officer Murphy testified that he observed the driver holding a black object in his hands. As he approached the jeepster, Officer Murphy noticed the driver bend directly forward and appear to "stuff" it under the seat. Murphy opened the driver's side door, asked the driver for his license and registration, and asked him to get out of the jeepster. He then escorted the driver to the back of the vehicle and informed Whitmore of the earlier furtive gesture. When questioned about that gesture, the driver explained that he was adjusting the emergency brake. Looking into the car, however, Whitmore noticed that the emergency brake was located not underneath the driver's seat but on the left side of the steering wheel under the dashboard. Thereupon, Whitmore looked under the driver's seat and found a ski mask wrapped into a ball. Unfurling the mask, he found a loaded .22 Browning semi-automatic pistol with the safety off. At that he instructed Murphy to place the driver under arrest and ordered the passenger to leave the car. By this time a squadron of police cars had arrived on the scene and the two suspects were handcuffed, placed under arrest, and escorted into separate cruisers.

At trial, both Murphy and Whitmore identified the defendant as the passenger and his brother, Theodore Hassapelis, as the driver.

After the suspects had been secured, Murphy and Whitmore returned to the jeepster and resumed their search. Opening the passenger's side door, Murphy reached in and seized a zippered "gym bag" lying on the floor in front of the seat. He unzipped the bag, pulled apart the handles, and took out the following items: a loaded .22 Ruger semi-automatic pistol, a baseball cap, a dish towel, two more ski masks, a hunting knife, a sheath, newspapers, gloves, a binocular case, and a flashlight which was turned on. A pair of binoculars was also discovered on the floor of the rear compart-

---

1. The defendant and his brother claimed that they left MacDonald's house and drove to the parking lot to discuss an upcoming camping trip.

ment. After the search was completed, the jeepster was impounded and taken to the station.

At trial, the defendant and his brother took the stand. Their explanation for their activities was such as to give lameness a bad name. They stated that they were accustomed to having guns and knives about for as long as they could remember and that they had done some target shooting near their grandmother's house, where the defendant lived, on the afternoon prior to their arrest. Although they usually left the pistols and the binoculars, which they claimed to have used for checking targets, in the defendant's room at their grandmother's house, for no apparent reason they decided that on that particular day they would go straight into Portland and take the guns and the binoculars with them.

They arrived at MacDonald's house at roughly 8:00 p. m. and departed at around 1:30 a. m. Sunday morning. The defendant stated that at some time during that mid-December evening he had gone out to his car, which had been parked in front of the house for two days, and had worked on it in the pitch-blackness.

The defendant, his brother, and their mother, who was called by the defense, testified that the jeepster always ran roughly after being started and that it was common practice in the family to let it run for ten to fifteen minutes after starting it. Theodore Hassapelis testified that he drove off as soon as he had started the car. He could give no reason for this departure from the norm.

Despite the fact that they intended to spend the night at the house where Theodore was living, they drove off in the opposite direction down Pitt Street toward The Place. The jeepster stalled just 25 feet short of Forest Avenue, and they pulled over to let it warm up for ten or fifteen minutes, shutting off all of the battery-drawing accessories. Thereafter, they circled back to MacDonald's house to check the defendant's car. Theodore, who testified first, explained that "we just always go by to check it." The defendant explained that he had forgotten to lock the car after having worked on it earlier that evening.

The court found the defendant guilty beyond reasonable doubt of conspiracy to commit armed robbery.

I

■ The defendant argues that the indictment[2] was fatally deficient. He points out that under 17–A M.R.S.A. § 651 a person can commit robbery in a variety of ways depending upon whether the person threatens or actually uses force and, if a

2. The indictment stated as follows:

STATE OF MAINE

VS.

NICHOLAS HASSAPELIS

THE GRAND JURY CHARGES:

INDICTMENT FOR VIOLATION OF
17–A M.R.S.A. SECTION 151(1)
SEE 17–A M.R.S.A. § 651
(CONSPIRACY)
CLASS B CRIME

That on or about the eighteenth day of December, 1977, in the City of Portland, County of Cumberland and State of Maine, the above named defendant NICHOLAS HASSAPELIS, with the intent that conduct he performed which in fact would constitute a crime, namely, Robbery While Armed with a Firearm against one Robert H. Litman, Robert H. Litman doing business as "The Place" or employees thereof, did agree with another person, namely, one T_____, a juvenile, to engage in such conduct; the said NICHOLAS HASSAPELIS and the said T_____ did engage in a substantial step toward commission of the crime, namely, the said NICHOLAS HASSAPELIS did proceed with the said T_____ to the vicinity of a variety store known as "The Place" on Forest Avenue in said Portland just before 2:00 A.M., the time at which the said store closed, in an automobile with two loaded .22 caliber pistols and three knitted ski masks which would cover most of a person's face, and did sit in the said automobile on a side street across Forest Avenue from the said store and observe the said store.

threat is used, what the threat sought to accomplish. The defendant argues that the phrase "robbery while armed with a firearm" is defectively imprecise because it fails to inform him which category of robbery he is accused of having conspired to commit.

In *State v. Chick*, Me., 263 A.2d 71, 76 (1970), we noted that

in conspiracy cases, if the deed to be accomplished or purpose to be promoted by the confederacy is in itself criminal or unlawful in that it is *descriptive of a well defined and well recognized criminal offense, the nature of which is perfectly understood by the name by which it is designated such as murder, robbery or rape, no further description of the intended crime need be made and the particular means to be used in the commission of the intended criminal offense need not be set out in the indictment.* [citations omitted]. When the means, by which the object of the conspiracy is to be accomplished are not set forth in the indictment as in the instant case, the purpose itself should appear to be unequivocally illegal and forbidden by law, or the indictment cannot be sustained. The charge must, in the totality of its averments, point up the criminality of the purpose underlying the conspiracy, and when the intended object of the unlawful combine as described does not appear to be in and of itself criminal or unlawful, then the particular unlawful means upon which the plotted activity rests must be distinctively set out therein. (emphasis supplied).

This formulation was quoted with approval in *State v. James*, Me., 310 A.2d 267, 268–69 (1973). We see no reason to depart from the reasoning set forth in *Chick*. Finding it a more than adequate answer to defendant's assertion, we offer no further comment.

## II

Regarding the various items found by Officers Whitmore and Murphy and subsequently introduced at trial, the defendant argues that the searches of the jeepster and of the contents of the zippered gym bag violated the warrant clause of the Fourth Amendment to the Constitution of the United States made applicable to the states under the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). We hold that the officer's initial pre-arrest search, which produced the gun and the ski mask found under the driver's seat, was reasonable, was supported by probable cause, and took place under exigent circumstances. Furthermore, although we conclude that the search of the gym bag was constitutionally invalid, we hold that the admission into evidence of the contents of the bag was harmless error beyond a reasonable doubt.

### A

We address first the question of whether the search and seizure of the ski mask and the gun found under the driver's seat was within constitutional bounds. Our review is guided by certain well-recognized principles developed in prior cases. Only reasonable searches are valid, *State v. Barclay*, Me., 398 A.2d 794, 796 (1979), and a search is unreasonable per se unless authorized by a warrant issued by a neutral and detached magistrate who has determined that probable cause for the search exists. *State v. Barclay, supra* at 797. The warrant requirement may, however, be dispensed with under exigent circumstances " 'in which procurement of a warrant would have strong likelihood of frustrating the fulfillment of the governmental interest conferring the probable cause to intrude upon the privacy of property.' " *State v. Barclay, supra* at 797, *quoting State v. Richards*, Me., 296 A.2d 129, 136 (1972). Further, where it is alleged that the warrantless search falls within one of the Fourth Amendment's "carefully drawn and much guarded exceptions," *State v. Dunlap*, Me., 395 A.2d 821, 824 (1978), *citing Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the State must prove the exception by a fair preponderance of the evidence. *State v. Heald*, Me., 314 A.2d 820, 829 (1973).

■ As we held in *State v. Smith*, Me., 379 A.2d 722, 724–25 (1977),

[p]robable cause to search exists when the officers' personal knowledge of facts and circumstances, in combination with any reasonably trustworthy information conveyed to the police, would warrant a prudent person believing that the search would disclose criminal conduct or items that would aid in identifying a criminal or establishing the commission of a crime.

In holding the search in question to have been reasonable and supported by probable cause, the presiding Justice found that

(1) the officers had information that The Place would soon be burglarized and/or its proprietors robbed;

(2) two persons were seen in a motor vehicle watching that establishment in the wee hours of the morning;

(3) the occupants of the vehicle acted in a suspicious manner; and

(4) when stopped, they "apparently engage[d] in activity which indicate[d] that they [were] secreting or hiding something under the seat of the automobile."

The record provides ample support for these findings; certainly, we cannot say they are "clearly erroneous." *State v. Dunlap, supra* at 824; *State v. Carter*, Me., 391 A.2d 344, 346 (1978). We also agree with the presiding Justice that their observations coupled with their information, together with the logical inferences flowing from both, gave Officers Murphy and Whitmore probable cause to believe that a search would turn up evidence of a crime.

■ Given the existence of probable cause, it is also clear that the officers were entitled to make an immediate search of the jeepster under the familiar "automobile exception." *State v. Morton*, Me., 397 A.2d 171 (1979); *State v. Cress*, Me., 344 A.2d 57 (1975); *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). It must also be noted that the initial exploratory search under the driver's seat was wholly reasonable in scope, particularly in light of the driver's obviously false statement that he had been adjusting the emergency brake.

In short, we discern no constitutional barrier to the admission of the ski mask and the pistol found under the driver's seat.

**B**

In *Arkansas v. Sanders*, —— U.S. ——, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979), the United States Supreme Court reviewed its decisions in *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), and *Chambers v. Maroney, supra*, and held that when an automobile is validly though warrantlessly stopped and searched, an item of personal luggage found within the automobile may not under normal circumstances be immediately opened and searched even where the police have probable cause to believe that it contains fruits, instrumentalities, or evidence of crime. The Court made clear that in such a case the police may lawfully seize the luggage but must await the issuance of a warrant before opening it. *Arkansas v. Sanders, supra* at ——, 99 S.Ct. at 2594, 61 L.Ed.2d at 235.

Judged by the *Sanders* standard, the search of the zippered gym bag found on the floor of the jeepster in the case at bar was unconstitutional, and the contents of the bag should not have been admitted at trial. That established, we address the question of whether the error was harmless.

■ It is settled law that the commission of an error at trial, although of constitutional dimension, will not require reversal if it can be said that the error was harmless beyond reasonable doubt. *State v. Smith*, Me., 394 A.2d 259 (1978); *State v. Fitzherbert*, Me., 361 A.2d 916 (1976); *State v. Crider*, Me., 341 A.2d 1 (1975); *State v. Heald*, Me., 307 A.2d 188 (1973); *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). As in *State v. Fitzherbert, supra* at 920, here the defendant's guilt was proven "by overwhelmingly convincing evidence independent of the [illegally seized evidence]." In finding the defendant guilty, the presiding Justice indicated

that he credited the testimony of Jimmy MacDonald. "I find no reason," said the court, "for [MacDonald] to have given false testimony and his manner of testifying in Court in my opinion was very candid, very honest and very open. I don't think he lied under oath." In bench trials, the credibility to be accorded the testimony of a witness is entirely a matter for the court. *State v. Levi*, Me., 384 A.2d 40, 41 (1978); *State v. Gove*, Me., 379 A.2d 152, 153–54 (1977); H. Glassman, 3 Maine Practice § 23.5 (1967). Once believed, MacDonald's testimony to the effect that the defendant had declared his intention to "hit" The Place was devastating to the defendant's cause.

The presence of the defendant and his brother in the vicinity of The Place together with their highly suspicious actions prior to arrest firmly corroborated MacDonald's testimony. The flimsy account advanced by the defense was rejected out of hand by the presiding Justice who, putting it gracefully, found "too much explanation for too many possibilities."

Finally, given our ruling that the ski mask and the pistol found under the driver's seat were validly admitted into evidence, the contents of the gym bag were "[a]t most . . . only cumulative of the facts already in evidence." *State v. Crider, supra* at 8.

■ Taking the record as a whole, we find that the admission of the illegally seized evidence was harmless beyond reasonable doubt.

The entry is:

Appeal denied.

Judgment affirmed.