**STATE of Maine**

v.

**Michael A. PATTEN.**

Supreme Judicial Court of Maine.

Argued Sept. 7, 1982.

Decided March 8, 1983.

Wayne S. Moss, Asst. Atty. Gen. (orally), Augusta, for plaintiff.

Edward W. Klein, Michael Asen, Portland, amicus curiae for Maine Civil Liberties Union.

Sage, Ayoob & Langley, Richard A. Langley (orally) Fort Fairfield, for defendant.

Before McKUSICK, C.J., and GODFREY, NICHOLS, ROBERTS, CARTER and WATHEN, JJ.

McKUSICK, Chief Justice.

This appeal by the State from a pretrial suppression order, which was previously denied by this court in State v. Patten, 436 A.2d 387 (Me.1981) (Patten I), is back to us on remand from the Supreme Court of the United States for reconsideration in light of United States v. Ross, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). By Ross it is now clear that the police officers did not violate the fourth amendment to the federal constitution by searching the brown paper bag that they came upon in connection with their permissible warrantless search of Patten's automobile. Since the Superior Court entered, and the Law Court affirmed, the suppression order on the basis of a view of federal constitutional law now shown by Ross to be erroneous, we reverse that order.

I.

On November 27, 1979, around 8:00 p.m., Deputy Carl McHatten of the Aroostook County Sheriff's Department received a telephone call from an informant. The informant identified himself to McHatten and stated that Michael Patten, now the defendant in this case, had told him that upon leaving work at Loring Air Force Base at 10:30 that evening, he (Patten) would first go home to rest and then go to Bangor in the morning to procure marijuana. The informant had provided the deputy with reliable information on at least four prior occasions. Placing defendant under surveillance, McHatten observed defendant arrive at his Limestone home at 10:35 p.m. and leave the next morning at 8:15 with another person. Defendant headed south on Route 165, in the general direction of Bangor. Other members of the sheriff's department were alerted, and at 9:30 a.m. they observed defendant traveling south on Route 1 in Monticello. McHatten calculated that if defendant did go to Bangor, a round trip requiring about five hours, he would pass through Monticello again between 2:00 and 3:00 p.m. on his way back to Limestone.

At 2:50 p.m. defendant was spotted again in Monticello, heading north on Route 1, and a sheriff's deputy followed him. After some evasive driving behavior that indicated to the deputy that defendant suspected that he was being followed, defendant pulled off the road to "an area obscured from the view of persons traveling along U.S. Route 1 and an area where commerce does not take place under normal circumstances." There, sheriff's deputies detained and identified him. Shortly, McHatten arrived and began a search of the automobile without defendant's consent. Observing a jacket partially concealing a brown paper bag on the back seat of the car, McHatten

opened the bag and discovered a plastic bag filled with what he believed to be marijuana.[1] McHatten seized the bag and contents and escorted defendant to the sheriff's office, where he was formally arrested.

Defendant was charged with furnishing scheduled drugs in violation of 17–A M.R. S.A. § 1106 (Pamph.1979). Pursuant to M.R.Crim.P. 41(e), Patten moved to suppress the marijuana that the police found in the closed brown paper bag that they opened in the course of their warrantless search of his automobile. The Superior Court held that the police were justified in searching Patten's automobile without a warrant because, so it found from the evidence, 1) the State had probable cause to believe the car contained marijuana at the time of the search, and 2) exigent circumstances existed to justify the search without a warrant. The Superior Court, however, held, on the authority of *State v. Blais,* 416 A.2d 1253 (Me.1980), that, absent a warrant specifically for the search of the closed brown paper bag, the police could seize it, but not search it. The Superior Court therefore granted defendant's motion to suppress the contents of the paper bag.

On appeal by the State to this court in *Patten I,* we affirmed the suppression order in a memorandum of decision that cited *Blais,* and *State v. Hassapelis,* 404 A.2d 232 (Me.1979). The Law Court issued its decision in *Patten I* on October 30, 1981.

While the State's petition for certiorari to the United States Supreme Court was pending, that Court on June 1, 1982, held in *United States v. Ross,* that if probable cause and exigent circumstances justify the warrantless search of an automobile for contraband, that search may extend to every part of the vehicle and its contents, including any closed container that might conceal the contraband. On June 14, 1982, the Supreme Court granted the State's peti-

tion for certiorari, summarily vacated the Law Court's judgment in *Patten I,* and remanded the case to us "for further consideration in light of *United States v. Ross* . . . ." *Maine v. Patten,* 457 U.S. 1114, 102 S.Ct. 2919, 2920, 73 L.Ed.2d 1325, 1325 (1982).

## II.

It is obvious that the Supreme Court acted to vacate and remand, rather than to reverse, the Law Court's affirmance of the suppression order because it was uncertain whether our decision in *Patten I* was premised solely upon the United States Constitution. *See* R. Stern and E. Gressman, *Supreme Court Practice* § 3.32, at 235–36 (5th ed. 1978). We do not share that uncertainty. While this court found *Patten I* to be controlled by two Maine cases, *Blais* and *Hassapelis,* those cases were in turn based exclusively upon our understanding of the "closed container exception" to the "automobile exception" as developed in federal constitutional law.[2] Thus, *Patten I* represented our view of federal law—a view that, according to the holding of *Ross,* mistakenly limited the scope of a valid warrantless automobile search. Since the Supreme Court plainly intends the *Ross* decision to apply to any pending cases (including convictions that were not yet final at the time of the decision), 456 U.S. at 824 n. 33, 102 S.Ct. at 2172 n. 33, 72 L.Ed.2d at 593 n. 33; *see also United States v. Johnson,* 456 U.S. ——, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982), we now must reverse the Superior Court's suppression order—exactly as the Supreme Court itself undoubtedly would have done had we originally been more explicit about the exclusive federal foundation of *Patten I.*

■ Before directing entry of our mandate of reversal, however, we must address defendant's argument that *Ross* should not

---

**1.** Marijuana, a scheduled Z drug, is contraband that may be seized and confiscated by the State. 17–A M.R.S.A. §§ 1114, 1102(4)(B) (1983); 22 M.R.S.A. § 2383 (1980).

**2.** *Patten I* also cited *Robbins v. California,* 453 U.S. 420, 101 S.Ct. 2841, 69 L.Ed.2d 744, *reh'g denied,* 453 U.S. 950, 102 S.Ct. 26, 69 L.Ed.2d 1036 (1981), with the introductory signal "*See also.*"

be applied here to validate the search of the brown bag, for a reason that he has not before asserted in this court. Defendant now argues that in any event the warrantless search of *any* part of his automobile violated the fourth amendment because no exigent circumstances existed to prevent the timely obtaining of a search warrant for the automobile. We review the contrary finding of the Superior Court only for clear error. *See State v. Dunlap*, 395 A.2d 821, 824 (Me.1978).

■ Under the well-recognized "automobile exception," a warrantless search of a vehicle is valid only if, *inter alia*, exigent circumstances exist that make the obtaining of a warrant impracticable. *Blais*, 416 A.2d at 1256–57. Defendant contends that the search of his automobile was invalid because the sheriff's deputies had time to get a warrant before the search, and their failure to do so created the exigent circumstances now relied upon by the State to validate the warrantless search. Specifically, defendant asserts that the deputies had probable cause to obtain, and should have sought, a search warrant at 9:30 a.m., five and one half hours before the search, when defendant was observed traveling through Monticello in the direction of Bangor. Defendant attempts to derive some support for his cause from *Dunlap*, which held that "an exigency that will justify a warrantless search cannot be one which was created by *unreasonable* delay on the part of law enforcement authorities." 395 A.2d at 825 (emphasis added). The *Dunlap* court found that the trial court had acted properly in suppressing "the challenged items upon the ground that there was no objectively justifiable explanation for the State's failure to obtain a search warrant." *Id.*

Defendant's reliance upon *Dunlap* is misplaced. Several important differences distinguish *Dunlap* from the case at bar. In *Dunlap*, as the suppression justice later found, the police had probable cause, suffi-

cient to obtain a warrant to search a package, on the evening before the day of the search. 395 A.2d at 823–25. However, with "no objectively justifiable explanation," the police, and the assistant district attorney with whom they worked the next morning in preparing an affidavit to support a search warrant, did nothing to seek out a District Court judge until both Bangor-based judges were unavailable during the noon hour. Thus unable to get a warrant at that late time, the police intercepted and searched the package without one. *Id.* During the 15-hour delay, the police neither obtained nor sought to obtain additional evidence to strengthen the proof of probable cause that they already had. *Id.* at 825. That the police at their leisurely pace did try to get a warrant without further investigation suggests that they themselves were satisfied that a warrant would issue based on the facts available to them some 15 hours earlier. Thus, the *Dunlap* court labeled the delay unreasonable, negating any exigent circumstances to justify a warrantless search. *Id.*

■ In contrast, the Superior Court was justified in concluding that it was reasonable for the deputies in the instant case to try to gather more evidence to present to a magistrate. In *Dunlap* itself, this court, citing *United States v. Ferrara*, 539 F.2d 799 (1st Cir.1976), carefully noted that "where there is a fairly minimal factual basis for probable cause, the police may continue to investigate without first seeking a search warrant." 395 A.2d at 825. Since the facts in *Ferrara*, a recent decision in this federal circuit, are similar to those of the case at bar, an exposition of those facts is in order. The First Circuit found that federal agents had probable cause sufficient to obtain a warrant at least 16 hours both before one was sought and before the search of the vehicle involved in the case.[3] However, the agents had not sought a warrant immediately, but rather they had de-

---

3. Whether the warrant issued before the search is unclear. *United States v. Ferrara*, 539 F.2d 799, 800 (1st Cir.1976). In any event, the *Fer-* *rara* court treated the search as a warrantless one.

layed, placed the suspects under surveillance, and tried to "increase the quantum of evidence which they could present to the magistrate." *Ferrara,* 539 F.2d at 802. Before a warrant was obtained, exigent circumstances compelled a search of the vehicle. *Id.* at 803. Although the agents in fact gathered no further evidence during their surveillance, the court concluded that the delay was justifiable because the probable cause was not self-evident and the police could not have predicted with a reasonable degree of certainty that they would be able to obtain a search warrant. *Id.* at 802.

Just so, it was not clear error for the Superior Court to conclude that the deputies in the instant case, unlike the police in the *Dunlap* case, were never in a position where they could predict with a reasonable degree of certainty that they would be able to obtain a warrant; until defendant arrived in Monticello on his return trip from Bangor—only minutes before the search— and commenced his evasive driving behavior, the probable cause was not self-evident. At 9:30 a.m. on the day of the search the deputies were armed with only three bits of information: 1) the informant's merely predictive statement that defendant would go to Bangor for drugs; 2) the fact that defendant went home immediately after work, as the informant had predicted; and 3) the fact that defendant commenced a trip south, in the general direction of Bangor. The probable cause, if any, existing at that point was weak indeed. The Superior Court was perfectly justified in not faulting the deputies for placing defendant under surveillance rather than acting immediately to seek a warrant solely on the informant's tip. That defendant went home immediately after work proves nothing; that is not an unusual occurrence. That the following morning defendant traveled toward a point south of Limestone is an almost equally slender thread upon which to hang a search warrant request; the larger part of Maine, and indeed of the entire country, lies south of Limestone; defendant might have been going to any number of places. Thus, although it is possible that probable cause existed at 9:30 a.m., we cannot say that the suppression justice clearly erred by concluding that the deputies acted reasonably in making the judgment to bide their time before requesting a warrant and to seek further confirmation that defendant was indeed in the process of procuring drugs from Bangor.

Unlike the officers in *Dunlap,* who had no justifiable explanation for their delay, the deputies acted reasonably in investigating further and, in fact, did obtain the confirmation that they sought; defendant returned to Monticello after a lapse of time exactly equal to that required for a round trip from Monticello to Bangor, and, when the deputies started to follow him, defendant began to drive in an evasive manner, indicating that he suspected he was being followed, and ultimately drew off the road to a hidden area.[4]

■ We emphasize that the Superior Court was not by this record compelled to reach the conclusion that it did. In determining whether exigent circumstances are present, the trial judge must use his own judgment, applied to the evidence before him; we review his decision only for clear error. Similarly, we will not invalidate a warrantless search merely because, with our 20–20 hindsight, we would conclude that a warrant could have been obtained before the search. *See Dunlap,* 395 A.2d at 825. Unless the probable cause is self-evident on an objective basis and the police

4. Unlike the *Dunlap* officers, the objective conduct of the deputies in the case at bar never, prior to the northward return of Patten's car, indicated that they thought they had sufficient proof to get a warrant. Although the agents in *Ferrara,* with only the same probable cause that had existed some 16 hours earlier, did seek a warrant, *Ferrara* is distinguished from *Dun-* *lap* in a critical respect: the *Ferrara* agents made every effort to increase the amount of evidence with which to approach a magistrate; only after their efforts failed did they apply for a warrant with the information available to them, in order not to lose all opportunity to apprehend the suspects.

could be reasonably certain of obtaining a warrant, delay in moving for one, while they diligently seek further proof, does not require suppression of the fruits of a warrantless automobile search.

Only one further matter remains for comment. On this remand from the United States Supreme Court, defendant also adopts—in his oral argument, though not in his brief—the contention of the amicus's brief that article I, section 5 of the Maine Constitution prohibited the warrantless search of the brown paper bag, even if the fourth amendment per *Ross* did not. In order to meet this contention on its merits, we assume, without deciding, that if the search of the brown paper bag found in the course of searching Patten's automobile violated the Maine Constitution, this court would fashion and apply a state exclusionary rule as a sanction for that illegal police conduct. In any event, we find on the facts of this case no violation of the Maine search-and-seizure clause. For the reasons stated in this court's opinion issued today in *State v. Bouchles*, 457 A.2d 798, 800 (Me. 1983), we hold that a warrantless search of a vehicle for contraband, that is constitutionally permissible under the long-established "automobile exception," may be validly extended to a container, found in the vehicle, that is capable of containing the contraband. In this regard we find no reason to construe article I, section 5 of the State Constitution any differently than the fourth amendment of the federal constitution.

The entry must be:

Appeal of the State sustained.

Pretrial order suppressing contents of the closed brown paper bag found in the automobile search reversed.

GODFREY, ROBERTS and WATHEN, JJ., concurring.

NICHOLS, Justice, dissenting.

I cannot join today's majority.

All we have before us is an Agreed Statement of Facts upon which the parties chose to pursue this appeal. We examine that sparse statement in vain for any showing of "at least some countervailing factors" which might make this occasion truly an exigency. *Niro v. United States*, 388 F.2d 535, 539 (1st Cir.1968). The burden is on those seeking an exception from the warrant requirement to show the need for the exception. *United States v. Jeffers*, 342 U.S. 48, 51, 72 S.Ct. 93, 95, 96 L.Ed. 59 (1951). The State has not met that burden here.

Therefore, I would affirm the order of suppression.

CARTER, Justice, dissenting.

I dissent because I believe the result in this case is controlled by the holdings in *State v. Dunlap*, 395 A.2d 821 (Me.1978), *accord Niro v. United States*, 388 F.2d 535 (1st Cir.1968). I find that the clear failure of the State to carry its evidentiary burden of justifying the warrantless search is fatal in this case.

In *Dunlap*, we articulated certain basic "threshold" rules, binding on this Court, for addressing a State's appeal from a decision of the Superior Court finding a warrantless search unjustified. We stated: "searches conducted without a warrant are *per se* unreasonable, subject only to a few carefully drawn and much guarded exceptions.... Third, the burden is on the State, by a preponderance of the evidence, to establish the existence of such an exception." *Dunlap*, 395 A.2d at 824 (citations omitted). "Exigent circumstances" is an exception as to which the State has the burden of proof. *United States v. Jeffers*, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951); *McDonald v. United States*, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948); *Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948); *State v. Cress*, 344 A.2d 57 (Me. 1975); *State v. Walker*, 341 A.2d 700 (Me. 1975); *State v. Stone*, 294 A.2d 683 (Me.), *application for bail denied*, 409 U.S. 908, 93 S.Ct. 212, 34 L.Ed.2d 169 (1972); *State v. Chapman*, 250 A.2d 203 (Me.1969).

Our own definition of such an exigency is the clearest definition found in the decisional literature of any jurisdiction:

the warrant requirement may be constitutionally dispensed with if there are exigent circumstances *which demand immediate search and seizure, or both, to prevent likelihood of removal, concealment, destruction or other loss of the articles lawfully subject to seizure,* provided, of course, that the search and seizure is limited as to the method, place and time to be commensurate with such exigency.

*Stone,* 294 A.2d at 691 (emphasis added). Further, *Dunlap* establishes that a State's claim of exigent circumstances justifying a warrantless search where probable cause already exists

must be evaluated in terms of the time when the law enforcement authorities *first* had an opportunity to obtain a search warrant, *not merely from the time the emergency arose,* and the authorities *must come forward* with a satisfactory explanation of their failure to obtain a warrant. . . . In most cases applying the exigent circumstances doctrine[,] the police have neither the time to obtain a warrant nor the opportunity to avoid the ensuing emergency.

*Dunlap,* 395 A.2d at 824 (emphasis added) (citations omitted).

As I understand, *Dunlap* held that an exigency justifying a warrantless search cannot be one created by the law enforcement authorities' unreasonable delay. *Dunlap,* 395 A.2d at 825. The keystone of that rule is the observation by Chief Justice Aldrich in *Niro,* 388 F.2d at 540, that "[h]aste does not become necessary *in the present sense* if the need for it has been brought about by deliberate and unreasonable delay. This would allow the exception to swallow the principle." (emphasis added). *See Dunlap,* 395 A.2d at 825. If we may take the Court of Appeals at its word in *United*

*States v. Ferrara,* 539 F.2d 799 (1st Cir. 1976), rather than artfully reinterpreting the case as the majority does, this distinction between *Ferrara* and *Niro* is simple and straightforward: in the former, the agents were never "in a position where they should have realized that a warrant 'could readily have been had.'" *Ferrara,* 539 F.2d at 802 (quoting *Niro,* 388 F.2d at 539). In *Niro,* the Court specifically stated: "[W]e hold that the government cannot rely upon an expected arrest to seize stolen goods, the presence of which it long had probable cause to know of, simply to avoid the inconvenience of obtaining a search warrant." *Niro,* 388 F.2d at 539–40. The Court made it plain that "failure to obtain a warrant when one could readily have been had . . . will be fatal unless there are at least some countervailing factors." *Niro,* 388 F.2d at 539.

The distinction articulated in *Ferrara* does not undermine the *holding* of *Niro,* as the majority suggests. Rather, that distinction represents the application of the *Niro* holding to a particular set of facts. The foundational premise of the *Niro* holding, that a warrant could "readily be had," was not present under the facts in *Ferrara.* The applicable legal principles are easily discerned. If the officers could readily have obtained a warrant under the circumstances in advance of the actual seizure, a showing of legitimate exigency cannot be made in the absence of proof of some "countervailing factors" justifying the delay in attempting to obtain the warrant. The burden is on the State in such a case to make a showing of the existence of such countervailing factors in order to support a valid determination of exigency.

We review this suppression order on an Agreed Statement of Facts.[1] I read the

---

1. The substance of the Agreed Statement of Facts is as follows:

 1. On Friday, November 27, 1979, at approximately 8:00 o'clock p.m. Deputy Carl McHatten of the Aroostook County Sheriff's Department received a phone call from a confidential informant.

2. The informant identified himself and told Deputy McHatten that while working with Michael Patten at Loring Air Force Base the Defendant stated that he would be getting done work at about 10:30 p.m., that he would then go home to get some rest and that in the morning he would be leaving to go to Bangor to procure marijuana.

3. The confidential informant has on at least four (4) prior occasions provided information to Deputy McHatten which proved to be reliable.

4. Deputy McHatten observed Michael Patten arrive at his residence at 22 School Street in Limestone, Maine, at approximately 10:35 p.m. on November 27, 1979, in the previously described Dodge automobile.

5. McHatten continued surveillance [sic] of the Patten residence until 12:00 midnight at which time Mr. Patten apparently had not left the residence.

6. At 6:00 a.m., November 28, 1979, Deputy McHatten resumed surveillance of Defendant's residence and at 8:15 a.m. observed the Defendant and another person get into the Defendant's car and leave Limestone headed south on Route 165.

7. Deputy McHatten then contacted the Aroostook County Sheriff's Department and asked that someone watch for the Patten vehicle at some point south of Limestone.

8. At approximately 9:30 a.m. the Defendant's car was observed in Monticello by Deputy Keith Wheeler headed south on Route 1.

9. Deputy McHatten then contacted the Aroostook County Sheriff's Department and made arrangements with Sargetn [sic] Edgar Wheeler to have surveilance [sic] set up in the Houlton area.

10. Deputy McHatten advised Sargent [sic] Wheeler that if the Defendant did go to the Bangor area that McHatten expected that he would be returning to the Houlton area between 2:00 p.m. and 3:00 p.m. that day.

11. At approximately 1:00 p.m. that day McHatten and Chief Johndro of the Limestone Police Department left Limestone to go to the Houlton area to assist on surveilance [sic].

12. At approximately 2:50 p.m. Deputy Keith Wheeler again observed the Defendant's car proceeding north on U.S. Route 1 in Monticello.

13. The distance between Bangor and Monticello is approximately 125 miles one way and the round trip from Monticello to Bangor and back to Monticello could be accomplished in approximately five (5) hours.

14. Approximately five (5) hours and twenty (20) minutes had lapsed between the time Deputy Keith Wheeler first observed the Patten vehicle heading south on U.S. Route 1 in Monticello and the time he observed the Patten vehicle proceeding north on U.S. Route 1 in Monticello.

15. When advised by Deputy Keith Wheeler that he had spotted the Patten vehicle in Monticello, Deputy McHatten requested that Deputy Wheeler attempt to keep the vehicle in view and Deputy McHatten and Chief Johndro proceeded north from Houlton.

16. At approximately 3:00 p.m. Deputy McHatten was advised by Deputy Keith Wheeler that the Patten vehicle had pulled into the Smith Truck Stop in Blaine and then back on to U.S. Route 1 without stopping. At that point Deputy Keith Wheeler felt that the occupants of the Patten vehicle may have observed him following them and that Patten may attempt to lose him.

17. At that point Deputy McHatten advised Deputy Wheeler to obtain assistance from Deputy Hugh Turner in Mars Hill in assisting Wheeler in stopping the vehicle and also advised Wheeler that he should stop and hold the Patten vehicle until McHatten arrived.

18. In Mars Hill the Patten vehicle turned off U.S. Route 1 and was driven to an area behind the Exxon station in Mars Hill, an area obscured from the view of persons travelling along U.S. Route 1 and an area where commerce does not take place under normal circumstances.

19. At approximately 3:05 p.m., Deputy Wheeler and Deputy Turner drove along side the Patten vehicle for the purpose of detaining the vehicle as instructed by McHatten.

20. Deputy Wheeler and Deputy Turner approached the Defendant's vehicle and determined that Michael Patten was in fact the operator of the vehicle and that Michael Bell of Limestone was a passenger in the previously described Dodge vehicle.

21. At approximately 3:08 p.m., Deputy McHatten and Chief Johndro arrived at the scene.

22. Deputy McHatten showed Michael Patten identification and advised Patten that there was reason to believe that Patten had drugs in his vehicle.

23. McHatten asked Patten if he could search Patten's vehicle and Patten refused.

24. McHatten then advised Patten that due to the circumstances McHatten had reason to search the car and intended to do so.

25. McHatten then proceeded to search the Patten vehicle. McHatten observed in the back seat area of the right side of the car a jacket partically [sic] covering a brown paper bag. Deputy Turner removed the jacket and opened the brown paper bag.

26. McHatten looked inside the brown paper bag and observed a plastic bag filled with plant material packaged in several smaller plastic bags, which material McHatten believed to be marijuana.

27. McHatten look [sic] possession of the brown paper bag and its contents and the trunk of the Patten vehicle was searched by Deputy Keith Wheeler and Deputy John York.

28. McHatten and Chief Johndro then took Michael Patten to the Mars Hill Sheriff's Department office where he was advised of his rights and formally advised that he was under arrest.

Agreed Statement in vain to find a single factual assertion that addresses an explanation for the officers' delay, after 9:30 a.m. on the day of the search, in seeking a warrant to search the vehicle in question upon its return to the Houlton area later in the day.

In the absence of any explanation of that delay, it is impossible for either the trial court or this Court to judge *the reasonableness* of the delay which caused the exigency when the vehicle returned. It is crystal clear that the State not only failed, but did not even attempt, in this case, to make any showing of "countervailing factors" that justify the delay of five hours and twenty minutes referred to in the Agreed Statement. In point of fact, the total period of delay on the basis of the times set out in the Agreed Statement is nearly seven hours. The determinative question, therefore, is whether the officers should reasonably have known that a warrant could readily be had on the basis of what was known to them at 9:30 a.m. on the day of the search. *Niro,* 388 F.2d at 539.

There is no doubt that if Deputy McHatten had appeared before a magistrate at any time after 9:31 a.m. on the morning of the search and showed that magistrate, by affidavit, the facts Deputy McHatten then knew, he would have made a sufficient showing of probable cause to obtain a warrant to search the car on its return. This conclusion is more graphically made if we assume, *arguendo,* that Deputy McHatten followed that course and, in fact, obtained a search warrant, executed on the vehicle's return. If the Defendant's attack was now on the sufficiency of the showing of probable cause for the issuance of the warrant, I cannot, for a single moment, doubt that this Court would sustain, and validly so, the issuance of the warrant. If that were the postured issue, the majority opinion would not say that:

probable cause was not self-evident. . . At 9:30 a.m. on the day of the search the

deputies were armed with *only three bits of information:* 1) the informant's *merely predictive statement* that defendant was going to go to Bangor for drugs; 2) the fact that defendant went home immediately after work, as the informant had predicted; and 3) the fact that defendant commenced a trip south, in the general direction of Bangor. The probable cause, if any, existing at that point was weak indeed. . . That defendant went home immediately after work proves nothing; that is not an unusual occurrence. That the following morning defendant traveled toward a point south of Limestone is an almost equally slender thread upon which to hang a search warrant request; the better part of Maine, and indeed of the entire country, lies south of Limestone; defendant might have been going to any number of places.

457 A.2d at 810 (emphasis added). Rather, I would visualize that this Court's opinion evaluating the evidence of probable cause in that case would be likely to read as follows:

The deputy was called by a known informant, who had on four prior occasions provided to the deputy information which proved to be reliable. *See Aguilar v. Texas,* 378 U.S. 108, 114–15, 84 S.Ct. 1509, 1514, 12 L.Ed.2d 723, 729 (1964). The informant told the deputy that *the defendant had stated* to the informant that after getting off work at 10:30 p.m., he would go home to get some rest and that in the morning he would be leaving to go to Bangor to procure some marijuana. That information did not result from any conclusion of the informant produced by the application of his own mental processes to indirect or circumstantial evidence. Rather, the information was a recitation of the defendant's own direct declaration of his intended course of action and purpose, relayed through an informant of proven reliability. As such, it was properly to be given great weight as accurately reflecting what defendant would likely do on the morrow.

In addition to stating his purpose, the defendant specified his intended intinerary and timetable. The deputy confirmed by his own personal observation that the defendant's movements over the next nine hours and forty-five minutes were strictly in accordance with that schedule and itinerary. When last seen in Monticello, the defendant was headed south in the direction of the location to which he had declared he would go to procure the contraband.

The defendant asserts that the fact that he was observed going home after work proves nothing because that is not an unusual occurrence. The officer was not required to believe that defendant inexorably went home at 10:30 in the evening after finishing his daily labor. The fact that he did on this occasion *did* prove something; he was, in fact, conducting himself in accord with his own avowed program of action that would eventuate in his acquisition of the contraband. The deputy and the magistrate were permitted, for two reasons, to infer from the defendant's southerly route of travel that he was going to Bangor for his avowed purpose; 1) that is the direction in which Bangor lay and 2) that is where he had, himself, stated that he was going. "At

that moment, if not well before, the totality of the facts and circumstances within the officer's knowledge ripened without the slightest doubt into probable cause" to issue a warrant to search the vehicle on its return. *State v. Smith,* 379 A.2d 722, 725 (Me.1977).

If the issue of probable cause were so postured in this case and so resolved, I have no doubt that the opinion of the Court would be unanimous. If that is true, to turn the intellectual tables on the defendant is an exercise in judicial unfairness. The determination that the officer's knowledge as of 9:30 in the morning was insufficient to establish probable cause cannot be supported by reason and is completely destructive of the most rudimentary tenets of analytical consistency. No other Maine case can be found in which so much proof is found to constitute so little cause for rational conclusion.

If, as I believe is the case, probable cause existed at 9:30 a.m., the burden was on the State to show proof of "countervailing factors" justifying the seven hour delay during which no effort was made to either obtain a warrant or to "diligently seek further proof" [2] as to what defendant was about.

---

2. The majority attempts to rely on a finding by the Superior Court Justice that the officers certainly did not have probable cause at 9:30 a.m. and were justified in seeking further evidence to support a showing of probable cause. That reliance is misplaced because (1) no such "finding" was made and (2) there is no evidence to support any finding, if made, as to why the officers delayed in seeking a search warrant or what they did, if anything, while waiting for the car to return from Bangor. The trial justice simply observed:

It is *possible* that probable cause existed at the time police officers noticed the defendant driving south on Rt. 1 in Monticello at 9:30 a.m. on November 28, 1979. The State was *entitled* to gather further evidence to better substantiate its case on probable cause before seeking a search warrant. Clearly, it had a much stronger case of probable cause when the police officers observed defendant returning north at about 2:50 in Monticello.

(Emphasis added.)

The existence of probable cause is a matter of law; the "clear error" standard does not

properly apply on appellate review of a determination of whether probable cause existed. To interpret the first sentence of the Justice's observation as a determination that probable cause *definitely did not* exist (a manifestly questionable interpretation), is simply legally erroneous. The immediately following determination that the State was "entitled" to delay for the gathering of further evidence is, therefore, also legally in error. *Niro,* 388 F.2d at 538; *Dunlap,* 395 A.2d at 825.

The court makes no specific factual finding that either (1) the officers delayed seeking a warrant in order to gather further evidence or (2) that they, in fact, sought any further evidence during the period of the delay. If the justice had done so, such finding would have been clearly erroneous. The record does not contain a scintilla of evidence showing, or from which any inference can be made as to (1) what the officers did, if anything, during the period of delay, (2) why the delay occurred, or (3) that they had any concern whatever about their ability to make a showing of probable cause

457 A.2d 810. The majority's attempt to justify the delay for the latter reason is simply without support in this record. This record does not reflect that the deputies were involved in any effort to ferret out further evidence to establish either probable cause or the guilt of the defendant. They simply waited for the car to return from Bangor, where they well knew that it had gone, comfortable in the knowledge that when it did appear they would, without fail, stop it and search it. When it returned, they would have stopped and searched it, with or without the pretext of "evasive" driving, and the officers would have had probable cause to stop the car, on a showing of exigency. Likewise, they could have obviated the need to make such a showing of exigency by the simple expedient of obtaining, during that seven hour period, a search warrant, which they could most certainly have secured and which would, with equal certainty, have been legally issued.

The United States Supreme Court continues to stress the desirability of officers seeking and obtaining a search warrant when they may reasonably be expected to do so. *See, e.g., Katz v. United States,* 389 U.S. 347, 356–57, 88 S.Ct. 507, 514, 19 L.Ed.2d 576, 585 (1967) (fact that agents "did no more here than they might properly have done with prior judicial sanction" does not validate conduct). Here, the officers had reliable knowledge of sufficient probative force to justify the issuance of a warrant. The record suggests that they had nothing else to do until the vehicle returned from Bangor; according to the record, the officers did nothing else except sit and wait. That is precisely the result that *Dunlap, Niro,* and even *Ferrara,* relied on by the majority, proscribe. The purpose of the rule articulated in those cases is to secure a desirable and constitutionally mandated re-

sult; "[i]f no penalty will ever attach to a failure to seek a warrant, as distinguished from the officers making their own, correct, determination of probable cause, warrants will never be sought, as least when the search is expected to be accompanied by an arrest." *Niro,* 388 F.2d at 539.

I believe this case is well within the principle stated by the Massachusetts Supreme Judicial Court: "We hold here only that where the exigency is reasonably foreseeable and the police offer no justifiable excuse for their prior delay in obtaining a warrant, the exigency exception to the warrant requirement is not open to them." *Commonwealth v. Forde,* 367 Mass. 798, 803, 329 N.E.2d 717, 721 (1975). As we have, ourselves, stated the gist of the rule, "[i]n sum, an exigency that will justify a warrantless search cannot be one which was created by unreasonable delay on the part of the law enforcement authorities." *Dunlap,* 395 A.2d at 825.

---

between 9:30 a.m. and 2:50 p.m. on the day of the search.